**ABBOTTS DAIRIES DIVISION OF FAIRMONT FOODS, INC.,**
Plaintiff,

v.

**Earl L. BUTZ, Secretary of Agriculture.**

Civ. A. No. 71–549.

United States District Court,
E. D. Pennsylvania.

Jan. 9, 1975.

Roland Morris, Philadelphia, Pa., for plaintiff.

Sullivan Cistone, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

This case returns to the Court after being remanded to the Judicial Officer of the Department of Agriculture for a ruling as to whether there was substantial evidence to support a new milk-pricing system ordered for the Delaware Valley.

Following a hearing in June, 1969, the Acting Secretary of Agriculture on August 20, 1969, abolished "bracketed pricing" of milk in Federal Milk Marketing Order No. 4, the Delaware Valley Marketing Area,[1] 34 Fed.Reg. 13601. His-

torically, the prices paid by dairies to farmers for milk in this region were fixed under applicable federal law by the movement of certain economic indices. Under this system the milk price did not change unless the index crossed a fixed boundary. When it did so, the price per hundred pounds of milk would be adjusted by twenty cents. The new pricing system involves penny-by-penny movements and is based upon the price paid for milk by dairies the previous month in the Wisconsin-Minnesota federal marketing area. As the price there moves up or down, the price in the Delaware Valley will be increased or decreased by the same amount. Under the bracketing system, price changes were more infrequent, but also more pronounced and more likely to affect retail prices immediately. Under the new system, price changes are less likely to be passed on to the consumer at once or on an entire line of dairy products.

Objection to the abandonment of the bracketing system having been raised, the hearing was reopened on October 30, 1969, and a further decision issued by the Department's Judicial Officer on behalf of the Secretary of Agriculture, January 20, 1970, 35 Fed.Reg. 1017, retaining the penny-price adjustment method. As a representative of its trade organization, Abbotts Dairies first exhausted its administrative remedies and then brought the present action for judicial review under applicable provisions of the Agricultural Adjustment Act, 7 U.S.C. § 608c(15)(B).

In a previous opinion[2] I held that there was no evidence to support the de-

---

1. The Department of Agriculture regulates the price paid to farmers for milk in different regions of the country. The Delaware Valley Marketing Area is referred to as Order No. 4, which is not to be confused with federal pricing orders that are issued by the Secretary of Agriculture setting the price of milk that "handlers" (dairies) pay to "producers" (farmers). In Lehigh Valley Cooperative Farmers, Inc. v. United States, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962), the Supreme Court described the general scheme of milk-pricing. The eco-

nomics of the industry is discussed in Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L. Ed.2d 345 (1969), as well as the statutory efforts to provide that all dairy farmers receive uniform prices for their products.

The decision by the Secretary of Agriculture in the instant case also affected milk prices in the Washington, D. C., and Upper Chesapeake Bay milk marketing areas because their prices were pegged to that of the Delaware Valley.

2. 351 F.Supp. 561 (E.D.Pa.1972).

cision of August 20, 1969. I also said that certain purported findings of fact and the reasoning resting upon them did not form a basis for the conclusions reached and that the Secretary's decision was therefore invalid. Subsequently, the case was remanded to the Judicial Officer because in previous administrative hearings the question of whether the decision of August 20, 1969, was supported by substantial evidence had not been ruled upon.

In a lengthy decision, the Judicial Officer concluded that the order of August 20, 1969, was supported by substantial evidence. He further held that substantial evidence was not required as a basis for the Secretary's action, that the decision is not reviewable by this Court, and that the issue is moot because of subsequent changes in federal milk pricing orders.[3]

In going far beyond the scope of my remand, the Judicial Officer passed upon questions of jurisdiction and the power of this Court to review the Secretary's decision of August 20, 1969. While these are extraneous issues, I will discuss them because they constitute a strong and invalid challenge to the scope of judicial review and authority of the federal courts over milk pricing orders.

I. Action by Secretary of Agriculture Purporting to Terminate Bracketed Pricing was Ineffective or Illegal.

In detailing the recent price history of Order No. 4, the Delaware Valley Marketing Area, the Judicial Officer attempted to establish that by August 20, 1969, bracketed pricing was an obsolete concept that had been rendered inoperative by the Secretary's emergency actions during the previous three years.

It is undisputed that "historically" (for twenty years) milk prices in the Delaware Valley had moved in substantial integers (brackets) of approximately twenty cents, triggered by changes in an economic formula. Prices in other Northeast areas, such as New York, also moved pursuant to changes in an economic formula but on a penny-by-penny basis.

On March 2, 1966, the Secretary determined that an emergency situation existed in the dairy industry. He suspended[4] the pricing provisions of every marketing area which recognized seasonal declines during the spring and summer. In the Delaware Valley, the Secretary simply deleted certain figures in one column of the economic formula leaving the remaining language still effective.

The Secretary then issued another emergency suspension order on March 31, 1966, that increased Class I[5] milk prices twenty-four cents across the nation. In the Delaware Valley, however, because of the peculiarities of bracketed pricing, the economic formula was suspended in part to allow for only a twenty cent price increase.

From July 1, 1966 to March 31, 1967, in the Delaware Valley, the price was pegged at $6.20 by suspending a portion of the bracketed pricing formula.

3. For example, in August 1970, the Delaware Valley, Washington, D. C., and the Upper Chesapeake Bay Orders were merged into a new Middle Atlantic marketing area. 35 Fed.Reg. 7924, 10,273.

4. 7 U.S.C. § 608c(16) provides that the Secretary can terminate or suspend without a hearing any milk pricing order that he finds does not tend to effectuate the declared policy of the Act. There is nothing unusual in this type of action. There had been previous suspension orders in Order No. 4. In 1965, part of the pricing formulas was suspended for three months. 30 Fed.Reg. 3311.

In Carnation Co. v. Butz, 372 F.Supp. 883 (D.D.C.), C.A. 74–1807 (D.C.Cir. filed December 17, 1974), the Secretary's power under 7 U.S.C. § 608c(16), was limited to situations in which the order is suspended entirely. Partial suspensions of pricing orders were declared illegal without proper notice and hearing since they were in actuality amendments to the orders.

5. Class I milk is that which is used for home consumption as such. Class II milk is milk which is processed into cheese, ice cream, butter, etc.

In April, 1967, the Secretary decided that a temporary increase of twenty cents was necessary to stop the decline in milk production. Pursuant to this finding, a new bracketed pricing schedule was adopted for the Delaware Valley effective May 1, 1967, through April, 1968.

The Secretary determined in February, 1968, that another emergency increase was needed in the Class I price of milk. Thus, twenty-eight cents was immediately added to the bracketed price in the Delaware Valley. Subsequently, after a hearing, the price was increased another twenty-four cents in September, 1968. These emergency price increases were to be temporary and were effective only through April, 1969.

Without a hearing, on December 26, 1968, the Secretary announced that he was terminating a portion of the latest emergency price increase. He eliminated the words "through April, 1969" thus purporting to create a permanent pricing order for the Delaware Valley. The Secretary claims that by removing these words from the temporary suspension of the bracketed pricing formula he rendered bracketed pricing permanently inactive and "effected a 'permanent' change in the order." Therefore, the Secretary maintains that when making his findings and decision of August 20, 1969, he could properly proceed on the basis that a valid bracketed pricing formula did not exist and there remained only "obsolete" bracketing language.

Clearly every price increase in the Delaware Valley during this emergency period was in bracket type integers. No language was used to show that penny-by-penny price changes were contemplated, desirable, necessary, or intended for the Delaware Valley. In fact, several of the Secretary's decisions specifically took note of the particular bracketed pricing system and adjusted the emergency price increase to it. Only in his order of September 6, 1968, did the Secretary suggest that his prior decisions had "inactivated the formulas entirely in favor of specified prices." These words hardly qualify as a clear statement that prices will change thereafter on a penny-by-penny basis as prices in another market area go up or down.

The Agricultural Adjustment Act requires that the Secretary's orders be based upon evidence introduced at a hearing called for the purpose of considering the proposed action. 7 U.S.C. § 608c(4). Here there was no hearing held to consider the abandonment of bracketed prices. The Act does not permit the Secretary to suspend temporarily a pricing formula for an emergency situation, then unilaterally terminate that portion of the emergency order which makes it temporary, thereby creating, without a hearing, a permanent order which drastically changes the milk pricing policy of a market area. The recital of the Secretary's actions regarding price changes demonstrates that a bracketing policy was followed during this prolonged emergency period and that bracketing was either still in force in the Delaware Valley prior to August, 1969, or that it had been eliminated illegally by the Secretary.

As it is pointed out in Carnation Company v. Butz, 372 F.Supp. 883, 886 (D. D.C.), C.A. 74–1807 (D.C. Cir. filed December 17, 1974), where the basic content of a pricing order has been altered so that a new order materially different from the old results, the Act requires proper notice and hearing.

Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706, mandates a reviewing court to

(2) hold unlawful and set aside agency action, findings, and conclusions found to be . . . .

(D) without observance of procedure required by law.

Here the Secretary did not observe procedures required by law and the action by which he contends he eliminated

bracketed pricing in the Delaware Valley cannot be considered to have accomplished that result.

## II. Milk Pricing Orders are Subject to Judicial Review

The Judicial Officer's determination that a study of milk-pricing history in the Delaware Valley shows bracketing had been eliminated by 1968 forms the basis for his entire decision upholding the Secretary's order of August 20, 1969. From this conclusion, it is an easy step to find there was no obligation to reinstate bracketing however persuasive the supporting evidence might be and that since the matter is one for the Secretary's discretion, no right of judicial review exists.

■ While the Judicial Officer used the words obsolete, suspended, rendered inactive, permanent change, temporary, inoperative and not permitted to operate to describe the status of bracketed pricing in the Delaware Valley after 1966, nowhere did he suggest that bracketed pricing was explicitly terminated prior to August 20, 1969. Suffice it to say that I have found bracketed pricing existed in the Delaware Valley Order from 1951 to 1969, though the mechanics of its operation had been partially suspended during the last three years.

The Supreme Court has continually restated the strong general presumption that administrative action is subject to review:

[P]reclusion of judicial review of administrative action adjudicating private rights is not lightly to be inferred. . . . Indeed, judicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated. In Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681, we held that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." (citation omitted)

Barlow v. Collins, 397 U.S. 159, 166–167, 90 S.Ct. 832, 837–838, 25 L.Ed.2d 192 (1970).

Furthermore, the Court has consistently held that the intent of Congress in passing the Agricultural Adjustment Act of 1935 was to prevent the constitutional infirmity of delegating overly broad discretion to the Secretary. Brannan v. Stark, 342 U.S. 451, 469, 72 S.Ct. 433, 440, 96 L.Ed. 497 (1952). See Blair v. Freeman, 125 U.S.App.D.C. 207, 370 F.2d 229, 235–236 (1966). In another milk case, Zuber v. Allen, 396 U.S. 168, 185, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969) the Court stated, "It is clear that Congress was not conferring untrammeled discretion on the Secretary and authorizing him to proceed in a vacuum."

■ Clearly milk pricing orders are subject to judicial review. Fairmont Foods Co. v. Hardin, 143 U.S.App. D.C. 40, 442 F.2d 762 (1971). The Act, 7 U.S.C. § 608c (15)(B), specifically provides for review of the Secretary's milk pricing order by the District Court. It is true, of course, that the Secretary has great discretion and his factual findings, if supported by substantial evidence, are not subject to judicial change. Nonetheless, unless such evidence does exist, the Secretary's actions are subject to challenge on the grounds that they are arbitrary or capricious. Therefore, there is no merit in the Judicial Officer's assertion that the issuance or non-issuance of a milk pricing order is purely discretionary and unreviewable.

## III. Administrative Decisions Must be Supported by Substantial Evidence

■ This case was remanded to the Judicial Officer to allow him to determine whether there was substantial evidence to support the decision of August

20, 1969. Substantial evidence has been defined as the relevant evidence that a reasonable person might accept to support a conclusion. Consolo v. Federal Maritime Commission, 383 U.S. 607, 619–620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). It is more than a mere scintilla. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). See K. Davis, Administrative Law § 29.01, at 996–97 (Supp.1970).

 Section 8c(4) of the Agricultural Adjustment Act requires that the Secretary issue a pricing order based upon evidence adduced at a hearing, 7 U.S.C. § 608c(4). This means substantial evidence is required to support a milk pricing order. See Fairmont Foods Co. v. Hardin, 143 U.S.App.D.C. 40, 442 F.2d 762, 767 (1971); Lewes Dairy, Inc. v. Freeman, 401 F.2d 308, 317 (3d Cir. 1968), cert. denied, 394 U.S. 929, 89 S. Ct. 1187, 22 L.Ed.2d 455 (1969); George Benz & Sons v. Hardin, 342 F. Supp. 88, 89 (D.Minn.1972).

When he reviewed the record, the Judicial Officer decided that the Secretary's order of August 20, 1969, was founded upon substantial evidence. He stated that there was evidence which allowed the Secretary to infer that bracketed pricing in the Delaware Valley would not effectuate the policy of the Act and that a new system of penny-by-penny price movement tied to a Midwest index should be adopted. Beside the record, the Judicial Officer declared that the decision was based upon the administrative expertise and the total knowledge of the Secretary. This expertise, combined with eight prior milk pricing actions and circumstances well known to the milk industry, was the true basis of the Secretary's decision.

In fact, the Judicial Officer held that in not adopting bracketed pricing in the August, 1969, order, the Secretary could rely on his own expertise, evidence from the hearing or upon no evidence at all since it is presumed that a Cabinet Officer acts in a rational manner. To hold otherwise, he contended, would force the government to present substantial evidence to justify every administrative ruling.

In passing upon the soundness of the Judicial Officer's conclusions, the purposes of the June, 1969, hearings must be recognized. These hearings were convened to consider certain definite proposals as to milk pricing in Northeastern United States marketing areas. Proposal No. 1, made by various New York and New England dairies and cooperatives, suggested that the price of milk in the six Northeast marketing areas (including the Delaware Valley) be pegged at a penny-by-penny movement with the price of milk in the Chicago area. Proposal No. 3, by a Delaware Valley cooperative, recommended that a bracketed pricing system pegged to the Minnesota-Wisconsin price be adopted for the Delaware Valley. Proposals No. 2 and 4 suggested revisions for butterfat differentials in different areas of the Northeast. And Proposal No. 5 attempted to amend the allowable rate of assessment for administrative expenses. Evidence, both pro and con, was tendered at the hearing for each of these amendments, except for Proposal No. 3, referring to bracketing in the Delaware Valley, to which there was no opposition.

The Judicial Officer infers that since there was substantial evidence at the June, 1969, hearings supporting Proposal No. 1 for New York and New England price adjustments, there was in effect substantial evidence in support of the Secretary's adoption of Proposal No. 1 for the Delaware Valley. A close examination of the record discloses that this simply is not so and that all the evidence offered pertaining to milk pricing in the Delaware Valley either strongly favored or did not object to bracketed pricing.

First, while Proposal No. 1 did include the Delaware Valley it was

brought by and directed to the milk pricing policies in New York and New England Milk Marketing Areas. Second, the expert witnesses and representatives from the Delaware Valley unanimously supported the continuation of bracketed pricing in the Delaware Valley as the best method to maintain an orderly market and protect the rights of producers and consumers. Witnesses from other orders, while favoring penny-by-penny price movements as envisaged in Proposal No. 1 for their own areas, when asked about bracketed pricing for Order No. 4 stated they had no objection to that method of pricing in the Delaware Valley. There was absolutely no evidence produced on any proposal by witnesses or the government that would tend to show that any non-bracketed pricing system was desirable or would tend to effectuate the policy of the Act in Order No. 4.[6]

■ The substantial evidence relied upon by the Judicial Officer for legitimatizing the Secretary's inclusion of the Delaware Valley in a penny-by-penny price movement indexed to the midwest simply does not exist. All the evidence supporting Proposal No. 1 by the New York and New England experts was directed to their particular areas. Every reference in their testimony, either in direct or cross-examination, as to bracketed pricing in the Delaware Valley was either favorable or neutral. There is not one scintilla of evidence to show that anyone at that hearing *favored* penny-by-penny pricing for the Delaware Valley. Mere silence or evidence supporting penny-by-penny price movements in New York and New England will not suffice to allow the Secretary to draw any inference as to pricing policy in the Delaware Valley.[7] He cannot use that portion of the evidence that supports the implementation of Proposal No. 1 as to New York or New England as support for the implementation of Proposal No. 1 in the Delaware Valley and the eradication of bracketed pricing.

The Secretary justified the elimination of bracketed pricing in Order No. 4 by finding that only with penny-by-penny price movements could an interregional price alignment be maintained. There is, however, no evidence in the June, 1969, hearings as to the necessity or desirability of interregional price alignments based on a penny-by-penny movement. As the Judicial Officer explained:

There is, of course, no need to explain the desirability of interregional price alignment to one knowledgeable in the milk industry. This is as desirable as motherhood.

To a reviewing court, the desirability of motherhood as well as many administrative ad hominem presumptions still has to be supported by some evidence.

In Fairmont Foods Co. v. Hardin, supra, the District of Columbia Court of Appeals invalidated a decision of the Secretary of Agriculture that created certain geographic price differentials based in part on a finding of the need for interregional alignment. The Court stated that it could not find a basis for the Secretary's findings, "beyond mere speculation."

Actually, those acquainted with the milk industry know that because of the different blend prices [8] paid to produc-

---

6. This is conceded by the Department of Agriculture in its brief to the Judicial Officer at 26.

7. While New York milk prices historically moved by some economic formula, it did so in penny-by-penny integers, rather than in large twenty cent brackets. Proposal No. 1 was an attempt to tie these penny-by-penny movements with a midwest index rather than the old economic formula. No evidence was presented by supporters of Proposal No. 1 that it should apply to the Delaware Valley. In fact, most stated that they favored or did not oppose bracketed pricing in Order No. 4.

8. A blend price is a weighted average of Class I (fluid milk) and Class II (all other uses) milk prices determined by the use the handlers make of the milk they receive for a month.

ers in the Delaware Valley and other Northeast areas a price differential of up to 35 cents can occur.[9] This is well above the maximum fourteen cent price differential in Class I milk that can occur under a bracketed pricing system.

At the hearings, the New England and New York expert witnesses not only did not object, they did not even mention the possibility of interregional disruption caused by bracketed pricing in the Delaware Valley that the Secretary fears. In fact, there was general agreement by all that in the long run bracketed pricing was the method that would give needed stability to the marketing of milk.

The Judicial Officer really bases the validity of his decision on two assumptions. One is that the infallibility of the Secretary's administrative expertise precludes judicial review. Second, that the Secretary has no obligation to present any public evidence to support his decision. In both respects, the Judicial Officer is mistaken.

▇▇▇▇ The courts must give considerable weight and deference to agency decisions and interpretations based upon their experience and expertise. Superior Oil Company v. Udall, 133 U.S.App.

D.C. 198, 409 F.2d 1115, 1119 (1969); Lewes Dairy, Inc. v. Freeman, 401 F.2d 308, 320 (3d Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969); Queensboro Farm Products v. Wickard, 137 F.2d 969, 980 (2d Cir. 1943). A primary reason for Congress' delegation of its milk pricing functions to the Secretary of Agriculture was to take advantage of expertise that had been developed over the years. Hopefully this expertise has continued to increase so that, as pointed out by the Judicial Officer, the Secretary's expertise is greater than that of any expert witness. There is, however, no precedent which allows the Secretary to make a decision based solely on his administrative expertise and knowledge unless it has been introduced as evidence in a hearing record.

First, the statute clearly states that the Secretary, "shall issue an order if he finds . . . upon the evidence introduced at such hearing [that it] will tend to effectuate the declared policy of this chapter . . ."[10]

Secondly, the Department of Agriculture regulations provide that the Secretary may issue, "if the findings *upon the record* so warrant, a marketing order . . ."[11] Nothing is mentioned

---

9. A recent comparison of prices paid producers in three major milk orders demonstrates the wide price differential that exists even with penny-by-penny price movements.

| | Blend Price 1970 | 1971 | Class I Price 1970 | 1971 |
|---|---|---|---|---|
| Mid-Atlantic | $6.45 | 6.58 | $7.44 | 7.58 |
| New York-New Jersey Order | 6.10 | 6.23 | 7.29 | 7.44 |
| Eastern Ohio-Western Pennsylvania Order | 5.82 | 5.99 | 6.52 | 6.68 |

(U.S. Dept. of Agriculture, 1972 Agriculture Statistics 446).

There are various reasons for this differential. For example, in the New England and New York orders, most of the milk produced is bought at the higher Class I price and is used exclusively as fluid whole milk. In the Delaware Valley, however, up to twenty per cent of the milk produced is used for manufacturing purposes and is paid at the lower Class II rate.

---

10. 7 U.S.C. § 608c(4). The only additional findings the Secretary can issue are "other findings as may be specifically required by this section." There is no contention that an interregional price alignment is included in this phrase.

11. 7 C.F.R. 900.13a(d)(2) (emphasis added).

about extra-record facts, expertise, total knowledge, or circumstances well known to the industry. There is a specific provision for the introduction of evidence at a public hearing.[12] The presiding officer can take official notice of certain evidence.[13] Interested persons, however, must be given adequate notice and have a chance to show that the evidence officially noted is inaccurate or misleading.

After a public hearing, parties are permitted to file written briefs based upon the evidence received at the hearing. Only facts introduced into the record or officially noted can be alluded to and facts outside the record "shall not be considered in the formation of the marketing agreement or order."[14] Obviously the Secretary must comply with his own regulations.

■ While administrative expertise does encompass powers of analysis not possessed by others, such analysis must be justified by reference to objective evidence, Fairmont Foods Co. v. Hardin, supra, 442 F.2d at 772. I agree with the District of Columbia Court of Appeals when it says that administrative expertise is strengthened, not crippled by a requirement of substantial evidence, Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 850 (1971), cert. denied, 406 U.S. 950, 92 S. Ct. 2042, 32 L.Ed.2d 338 (1972).

The Supreme Court has warned:

Expert discretion is the lifeblood of the administrative process, but "unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion." [It's] for the courts to determine whether the agency *has* [abused its discretion.] (citations omitted)

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). See Baltimore & Ohio R. Co. v. Aberdeen R. R. Co., 393 U.S. 87, 91–92, 89 S.Ct. 280, 283, 21 L.Ed.2d 219 (1968), rehearing denied, 393 U.S. 1124, 89 S.Ct. 987, 22 L.Ed.2d 131 (1969).

■ The Secretary's second assumption, that evidence to support his finding need not be placed into the record has been touched on in the above discussion. The requirement that administrative findings be supported by substantial evidence requires the government to introduce evidence if its findings will not be supported by the record created by non-government witnesses. Reliance exclusively on agency expertise is insufficient. Administrative expertise is the value of the administrator's experience in interpreting and analyzing facts to make the proper findings and decision. However, to make findings without facts is like building a house without a foundation.

The purpose of requiring the government to produce evidence at a hearing is twofold. First, it will create an evidentiary record on which the Secretary can make his findings based on clear and rational choices. It allows a court to understand the basis for the Secretary's decision and intelligently rule on whether the decision is lawful and supported by substantial evidence.[15]

Secondly, to require the introduction of evidence by the government and force it to reveal publicly the facts which form the basis for the Secretary's decision allows interested parties to test, refute, rebut or buttress these facts. This is what a fact finding hearing is all about. It is an educational process, not only for the Secretary, but also for the public, Congress and the courts so that ultimately the best decision is made.

---

12. 7 C.F.R. 900.8(d).

13. 7 C.F.R. 900.8(d)(5).

14. 7 C.F.R. 900.9(b).

15. In fact, the Presiding Officer specifically stated that any final action on the proposed amendments had to be based on the record made at the hearing. T.R. 9 (June 16, 1969).

For the Secretary to hide the facts behind a facade of administrative expertise would be to frustrate the congressional intent of the Agricultural Adjustment Act and the Administrative Procedure Act. The facts could then never be challenged, never tested. Ultimately the absence of facts would result in incestuously perverting administrative integrity and public confidence in government.

Professor Davis has commented:

When the facts are both decisive and debatable, the tribunal probably should not use them in a final decision without first giving the parties a chance to contest them, at least with briefs and arguments. . . .

[N]ot . . . all facts the tribunal considers must be in the record . . . The basic principle is that parties should have opportunity to meet in the appropriate fashion all materials that influence decisions. Nothing short of opportunity for cross-examination and presentation of rebuttal evidence is appropriate for disputed adjudicative facts at the center of the controversy. . . .

2 K. Davis, Administrative Law § 15.10, at 402–04 (1958).

 The Judicial Officer argues that it is presumed that a Cabinet officer acts in a rational manner. Like most presumptions, however, it is rebuttable. There also is a presumption of the existence of facts justifying an administrative decision, but this is rebuttable if shown to be unreasonable or arbitrary, Thompson v. Consolidated Gas Utilities Corp., 300 U.S. 55, 69–70, 57 S. Ct. 364, 371, 81 L.Ed. 510 (1937).

The much discussed "declared policy" of the Agricultural Adjustment Act is simply to maintain an orderly market to protect producers and consumers, 7 U.S. C. § 602. In order to find that a milk pricing order will tend to effectuate the declared policy of the Act the Secretary must give reasoned consideration to all material facts and issues.

This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts . . .

Greater Boston Television v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1971), cert. denied, 406 U.S. 950, 92 S. Ct. 2042, 32 L.Ed.2d 338 (1972). There must be a *rational* basis on the record to support the Secretary's decision. Fairmont Foods Co. v. Hardin, supra, 442 F.2d at 771. The facts necessary to support the inferences and findings must be in the record. Zuber v. Allen, 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 244, 9 L.Ed.2d 207 (1962); Blodgett Uncrated Furniture Service, Inc. v. United States, 288 F.Supp. 591, 599 (W.D.Mich.1968).

I cannot find, nor has the Secretary shown, a rational basis in the record for his decision of August 20, 1969. The Judicial Officer presents various arguments, but as the Supreme Court has warned, the reviewing court cannot accept, *"post hoc* rationalizations for agency action . . ." Burlington Truck Lines, Inc. v. United States, supra, 371 U.S. at 168, 83 S.Ct. at 246. Therefore, the decision was arbitrary and capricious and must be reversed.

IV. Mootness

Finally, the Judicial Officer suggests that this Court cannot grant appropriate relief because of mootness. He bases this on the fact that on August 1, 1970, the Delaware Valley Order ceased to exist, having been merged with the Washington, D. C. and Chesapeake Bay Orders to form the Middle Atlantic Marketing Area. 35 Fed.Reg. 7924, 10,273. Furthermore, the most recent Middle Atlantic Order was promulgated on March 30, 1972, 37 Fed.Reg. 6479, superseding all previous pricing orders.

Mootness results when there is no longer a concrete controversy, only an abstract or hypothetical question to decide. Nader v. Butz, 154 U.S.App.D. C. 178, 474 F.2d 426, 428 (1972). Certainly in this case there is still a concrete controversy over the legality of the Secretary's decision of August 20, 1969. Many thousands of dollars have been paid into a Producer-Settlement Fund [16] pursuant to a court order.[17] The plaintiff contends it is entitled to damages for overpayments resulting from the Secretary's illegal decision.

Since the present Middle Atlantic milk pricing order has in effect simply preserved and brought up to date the Secretary's original order of August 20, 1969, the case is not moot. United States v. Wrightwood Dairy Co., 127 F.2d 907, 912 (7th Cir.), rev'd on other grounds, 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942); United States v. Lehigh Valley Cooperative Farmers, 183 F.Supp. 80, 91 (E.D.Pa.1960), rev'd, 287 F.2d 726 (3d Cir. 1961), rev'd, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962). See United States v. Rock Royal CO–OP, Inc., 307 U.S. 533, 556–557, 59 S.Ct. 993, 1005, 83 L.Ed. 1446 (1939).

V. Conclusion

As far as the record is concerned the Secretary of Agriculture's decision of August 20, 1969, was based on mere speculation. There is no substantial evidence to support the decision and it is therefore arbitrary and capricious and must be set aside.

16. The Producer-Settlement Fund is organized in each milk marketing area so that each farmer receives the same uniform blend price for his milk. Each fund is administered by an agent of the Secretary of Agriculture. He determines the percentage of milk utilized as Class I (fluid milk) or Class II (other products) that is processed by the area's dairies thereby achieving an average or "blend" price for each pound of milk. Every farmer receives this price for his milk. Thereafter each dairy that utilizes more milk as Class I than as provided in the

blend pays in such excess to the pool. Other dairies withdraw funds if their utilization of Class I milk is below the blend percentage. See Dairylea Cooperative, Inc. v. Butz, 504 F.2d 80, 85 (2d Cir. 1974).

17. The Department of Agriculture has obtained an injunction that requires the plaintiff to make payments in accordance with the milk pricing orders promulgated by the Secretary. United States v. Abbotts Dairies, No. 70–781 (E.D.Pa., filed Aug. 21, 1970).