**ABBOTTS DAIRIES DIVISION OF FAIRMONT FOODS COMPANY, Petitioner,**

v.

**Bob BERGLAND, Secretary of Agriculture, Respondent,**

and

**PennMarva Dairymen's Cooperative Federation, Inc., Intervenors.**

Civ. A. No. 71–549.

United States District Court, E. D. Pennsylvania.

June 16, 1977.

Roland Morris, Philadelphia, Pa., for Abbotts.

Donald F. Copeland, Philadelphia, Pa., for PennMarva.

John Sandor, Washington, D. C., for respondent.

## OPINION

DITTER, District Judge.

The question presently under consideration in this case, which is before the court for the fourth (and hopefully final) time, is whether a milk handler (diary) is entitled to recover damages from the producer settlement fund for overpayments made to the fund and to milk producers (farmers) because of an illegal milk pricing order issued by the Secretary of Agriculture.

The factual background and procedural, history of this case have been exhaustively recounted in my earlier opinions[1] and need not be repeated here. Suffice it to say that on August 20, 1969, the Secretary issued a milk pricing order for the Delaware Valley marketing area that changed a previously existing bracketed pricing system, under which the price paid by handlers to producers moved in intervals of twenty cents per hundred pounds, and substituted in its stead a system whereby milk prices in the Delaware Valley moved on a penny-by-penny basis according to changes in prices in the Minnesota-Wisconsin area. In an opinion issued on January 9, 1975 (see 389 F.Supp. 1) and adhered to after reconsideration on October 4, 1976 (see 421 F.Supp. 415), I held that the Secretary's decision to adopt penny-by-penny pricing was not supported by substantial evidence and therefore was invalid.

*Abbotts' Claim*

The plaintiff in this case, Abbotts' Dairies, is a milk handler. For thirteen months prior to the invalid August 20, 1969, order the price for Class I milk in the Delaware Valley had been pegged by the Secretary at $7.17 per hundredweight. The effect of the purported order was to raise this price by varying amounts in each month after August, 1969. However, since the decision was illegal, the pre-existing price of $7.17 per hundredweight remained as the only

---

1. See my earlier opinions reported at 421 F.Supp. 415 (E.D.Pa.1976); 389 F.Supp. 1 (E.D. Pa.1975); 351 F.Supp. 561 (E.D.Pa.1972). That portion of my opinion of October 4, 1976, which denied the petition of various farmer cooperatives to intervene for all purposes was recently affirmed by the Court of Appeals, *Abbotts Dairies Division of Fairmont Foods v. Hardin*, 559 F.2d 1207 (3d Cir. filed June 6, 1977) (Judgment Order).

valid order price in the Delaware Valley. Therefore, theoretically Abbotts might contend that it is entitled to damages computed on the basis of the difference between the order price and $7.17 multiplied by Abbotts' total hundredweight purchases of Class I milk for each month from September, 1969, to the present time. That such a damage computation would be only theoretical stems from the fact that the order price set by the Secretary is merely the *minimum* price that handlers must pay farmers for milk. See *Borden, Inc. v. Butz,* 544 F.2d 312, 318 (7th Cir. 1976). Farmers are free to sell their milk at higher prices if market conditions enable them to do so. In view of rising prices in the economy in general and in milk prices in other areas of the country [2] in particular, it is chimerical to suggest that farmers would have been willing to sell their milk to handlers for the same $7.17 per hundredweight price throughout the period from September, 1969, to the present. Apparently recognizing this, Abbotts has scaled down considerably its request for damages in terms of both the price differ-

ential and the period of time for which damages are claimed.

The price which Abbotts uses in making its computations is that which would have been set under a bracketed pricing formula proposed but not adopted at a June, 1969, hearing that preceded the challenged decision. The price under this formula (and which Abbotts concedes it would have been willing to pay) was higher than the $7.17 per hundredweight price in existence prior to the invalid order but lower than the price established by that order. Abbotts also asks for damages only for the period from September, 1969, the month when the illegal order purportedly went into effect, until July, 1970, the last month before the geographic scope of this marketing region was increased to include the Washington, D. C. and Chesapeake Bay areas.[3]

Limited in the manner just described, the total amount claimed by Abbotts, exclusive of interest, is $166,536.45, computed as follows:

| Month | | Class I Pounds | Announced Order Price | Proposed Bracketed Price | Price Difference | Change in Value |
|---|---|---|---|---|---|---|
| Sept. | '69 | 22,723,613 | $7.26 | $7.17 | −.09 | $20,451.25 |
| Oct. | '69 | 24,594,803 | 7.33 | 7.37 | + .04 | (−$9,837.92) |
| Nov. | '69 | 21,907,402 | 7.42 | 7.37 | −.05 | $10,953.70 |
| Dec. | '69 | 22,800,526 | 7.46 | 7.37 | −.09 | $20,520.47 |
| Jan. | '70 | 22,194,193 | 7.47 | 7.37 | −.10 | $22,194.19 |
| Feb. | '70 | 20,220,229 | 7.51 | 7.37 | −.14 | $28,308.32 |
| Mar. | '70 | 21,701,959 | 7.47 | 7.37 | −.10 | $21,701.96 |
| Apr. | '70 | 22,458,730 | 7.42 | 7.37 | −.05 | $11,229.37 |
| May | '70 | 21,252,311 | 7.44 | 7.37 | −.07 | $14,876.62 |
| June | '70 | 19,923,017 | 7.42 | 7.37 | −.05 | $ 9,961.51 |
| July | '70 | 20,221,225 | 7.45 | 7.37 | −.08 | $16,176.98 |
| | | | | | Total | $166,536.45 |

I accept $166,536.45 as the outer limit of Abbotts' entitlement but wish to make it crystal clear that my reason for doing so is simply that this is the maximum amount Abbotts has asked for and it would be inappropriate to award more damages than

claimed. In particular, my acceptance of the price based on the proposed bracketed formula as the outer limit in computing the price differential for damage purposes should not be interpreted as an indication that this court believes that formula was

2. For example, the affidavit of Herbert L. Forest, Director, Dairy Division, Agricultural Marketing Service, United States Department of Agriculture, shows that between September, 1969, and March, 1975, the price of milk in the

Minnesota-Wisconsin area rose approximately 55% from $4.42 to $6.85 per hundredweight.

3. See 421 F.Supp. at 417 n. 3.

supported by substantial evidence at the June, 1969, hearing or that it is the formula the Secretary should have adopted. I have made no such finding nor would I have the power to do so. As my earlier opinion makes clear, district courts have no authority to order the Secretary to adopt any particular milk pricing order; their judicial review function is limited to determining whether an order which the Secretary has in fact adopted is supported by substantial evidence. See 421 F.Supp. at 422 & n. 13. With this caveat stated, other aspects of the damage question may be considered.

### Damages as a Remedy

■ Neither the Secretary nor the intervenors [4] seriously contend as an abstract matter that damages are not an available remedy to redress injury resulting from an unlawful milk pricing order.[5] Although the issue has not been extensively dealt with in the case law, what little authority there is clearly supports the proposition that damages may be awarded in appropriate cases to remedy overpayments made on account of an illegal pricing order. See *Borden v. Butz,* supra, 544 F.2d at 319–20; *Fairmont Foods, Inc. v. Hardin,* 143 U.S.App.D.C. 40, 442 F.2d 762, 773 (1971); *Lawson Milk Co. v. Freeman,* 358 F.2d 647 (6th Cir. 1966); *Carnation Company v. Butz,* 372 F.Supp. 883, 889 (D.D.C.), appeal dismissed, No. 74–1807 (D.C. Cir. Dec. 17, 1974).[6] I too believe that damages are available in an appropriate case.

### Recovery from the Producer Settlement Fund

■ Both the Secretary and the intervenors also concede [7] that if damages are otherwise recoverable they must be paid out of the producer settlement fund, since it would be impractical for Abbotts to proceed individually against each producer from whom it purchased milk during the relevant period. See *Blair,* supra, 370 F.2d at 239. Indeed, when the Secretary sought enforcement of the price increase mandated by the unlawful order, after Abbotts initially had refused to comply, he specifically represented to the Honorable Alfred L. Luongo, to whom the enforcement action had been assigned that the producer settlement fund would be available to compensate Abbotts should the pricing order be set aside:

> However, in the event that the Department's Judicial Officer or the Courts should rule that there should nevertheless be some additional recovery by the defendant [Abbotts] from producers, directly or through the producer-settlement fund, the Court is advised that mechanisms now contained in the Order can operate to restore such payments immediately or over a period of time.

Government's Reply Brief at 10 in *United States v. Abbotts Dairies,* Civil Action No. 70–781. And there can be no question that Judge Luongo relied on this representation in denying Abbotts' request that disputed amounts be paid into court pending adjudication of the order's validity.

> I am satisfied, however, that there is no need for segregating the payments here. Abbotts will be adequately protected if the attack on the Order is ultimately

---

4. The intervenors are various farmer's cooperative associations that I permitted to intervene for the limited purpose of presenting their views on the damage question. See 421 F.Supp. at 418–19.

5. As will be seen in the discussion which follows, the Secretary and intervenors basic contention is that Abbotts has not shown it sustained any loss as a result of the unlawful order involved in this case.

6. While it is true that in *Zuber v. Allen,* 131 U.S.App.D.C. 109, 402 F.2d 660, 675–76 (1968),

aff'd 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969), the court refused to order refunds of overpayments made prior to the district court's final decision and in *Blair v. Freeman,* 125 U.S.App.D.C. 207, 370 F.2d 229, 239 (1968), the court refused to sanction any retrospective relief, these decisions turned on the particular equitable considerations involved in the cases and cannot be read as holding that retrospective relief may never be awarded.

7. See Brief for the Secretary at 8; Brief for Intervenors at 11.

upheld. There appears to be adequate provision within the workings of the producer-settlement fund for repayments or credits for such amounts as may be determined to have been overpaid to the fund. *United States v. Abbotts Dairies,* 315 F.Supp. 571, 574 (E.D.Pa.1970).[8]

In as much as payments made to handlers out of the producer settlement fund result in a reduction of monies available for farmers, the intervenors contend that it would be a violation of due process to award damages to Abbotts out of the fund without having joined the farmers as parties on the merits in this action. They also make much of the fact that not all the farmers who comprise the present marketing area were within it during the period for which damages are claimed, contending that it would be inequitable to penalize those who received no benefit from the unlawful pricing system. No authority is cited in support of these arguments and I find them unpersuasive.

■ In his affidavit of April 28, 1975, in support of the Secretary's motion for reconsideration, Herbert L. Forest, Director of the Agriculture Department's Dairy Division, stated that the producer settlement fund for this area contained a reserve which was more than adequate to cover the principal amount of the damages claimed by Abbotts.[9] Any recovery in excess of the reserves which might result from the award of interest may be handled by allowing Abbotts a credit against future reserves. See *Abbotts Dairies,* supra, 315 F.Supp. at 574. Requiring an aggrieved handler to join as parties each and every farmer within a marketing area as a prerequisite to obtaining damages from the area's producer settlement fund would not be significantly less burdensome than requiring the handler to proceed directly against its individual

farmer suppliers. *Blair,* supra, 370 F.2d at 239. It appears that one of the purposes of maintaining reserves in the producer settlement fund is to provide a source for the recovery of overpayments in cases such as this. Cf. *Lawson,* supra, 358 F.2d at 650, n. 5. See also the Forest Affidavit at 2, which states that the very purpose of the reserve is "to accommodate necessary adjustments to handler's accounts." While it is undoubtedly true that the farmers who make up a particular area will change with the passage of time, presumably they know the producer settlement fund must function on a continuous basis and that they will have to bear the burdens as well as reap the benefits of the milk marketing system established by the Secretary.[10]

Furthermore, in the enforcement proceedings before Judge Luongo, Abbotts specifically foresaw and attempted to avoid any possible inequity resulting from shifting farmer membership by asking that disputed payments be escrowed with the court. Judge Luongo denied this request. To hold now that his ruling precludes recovery from the producer settlement fund would be grossly unfair to Abbotts. I therefore conclude that the producer settlement fund is the appropriate repository from which any damages that may be awarded in this case should be paid.

*The Passing On Defense*

■ The primary argument advanced by both the Secretary and the intervenors is that Abbotts has not shown that the overpayments it made to producers were not reflected in the prices it charged its customers for milk and milk products. This so-called "passing on" defense has been rejected by the Supreme Court in a number of cases and I reject it here as well. In *Southern Pacific Co. v. Darnell-Taenzer Lumber*

---

8. The producer settlement fund has been utilized as the vehicle through which overpayments were recovered in other cases where refunds have been ordered. See *Borden, Fairmount Foods* and *Lawson, supra.*

9. Since the Secretary has not advised me otherwise in his latest briefing of the damage ques-

tion, I presume these reserves continue to exist in the present marketing area.

10. Since the refund will be absorbed by all the producers in the marketing area and may be spread out over a period of time the effect on each individual farmer will be minimal.

*Co.,* 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918), a case arising under the transportation laws, the Court held that it was no defense to a suit to recover overcharges that the plaintiff had passed the increased costs on to its customers.

> The general tendency of the law, in regard to damages at least, is not to go beyond the first step. As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss. The plaintiffs suffered losses to the amount of the verdict when they paid. Their claim accrued at once in the theory of the law and it does not inquire into later events. *Olds v. Mapes-Reeve Construction Co.,* 177 Mass. 41, 44, 58 N.E. 478. . . . Behind the technical mode of statement is the consideration well emphasized by the Interstate Commerce Commission, of the endlessness and futility of the effort to follow every transaction to its ultimate result. 13 I.C.C. 680. Probably in the end the public pays the damages in most cases of compensated torts.

*Id.* at 533–34, 38 S.Ct. 186. See also *Adams v. Mills,* 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184 (1932); *Louisville & N. R. Co. v. Sloss-Sheffield S & I Co.,* 269 U.S. 217, 46 S.Ct. 73, 70 L.Ed. 242 (1925). More recently, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Court rejected the passing on defense in the antitrust context, Justice White explaining its shortcomings in the following terms:

> We are not impressed with the argument that sound laws of economics require recognizing this defense. A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he

would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin or profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued. Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable. On the other hand, it is not unlikely that if the existence of the defense is generally confirmed, antitrust defendants will frequently seek to establish its applicability. Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories.

> In addition, if buyers are subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to *their* customers. These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness.

*Id.* at 492–94, 88 S.Ct. at 2231–32.[11] See also *Illinois Brick Co. v. Illinois,* 431 U.S.

---

11. The Secretary's reliance on *Anniston Manufacturing Co. v. Davis,* 301 U.S. 337, 57 S.Ct.

816, 81 L.Ed. 1143 (1937), and *United States v. Jefferson Electric Mfg. Co.,* 291 U.S. 386, 54

720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (U.S. filed June 9, 1977).

The *Hanover* Court noted two situations where its holdings on the unavailability of the passing on defense might not apply. The first, involving a buyer under a "cost-plus" contract with the defendant is fairly straightforward and is not at issue here.[12] The second exception is less clear cut. It was explained by the Court as follows:

> We also recognize that where no differential can be proved between the price unlawfully charged and some price that the seller was required by law to charge, establishing damages might require a showing of loss of profits to the buyer (footnote omitted).

*Id.* at 494, 88 S.Ct. at 2232. The intervenors contend that the farmers fall within this second exception since there was no differential between the price they charged handlers and the price they were required to charge under the Secretary's order. I disagree. In the footnote accompanying the language quoted above, the Court cited *American Can Company v. Russellville Canning Co.*, 191 F.2d 38 (8th Cir. 1951), and *American Can Company v. Bruce's Juices*, 187 F.2d 919, opinion modified, 190 F.2d 73 (5th Cir.), petition for cert. dismissed, 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951), as examples of cases where the second exception might apply. See 392 U.S. at 494 n. 10, 88 S.Ct. at 2232. Both of these cases involved price discrimination suits under the Robinson-Patman Act and are not analogous to the case at hand.

I recognize that some support for the intervenors position may be gleaned from the fact that *Hanover* distinguished *Keogh v. Chicago & N.W. R. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), on the grounds, *inter alia*, that there the rates charged by the shipper had been approved as reasonable by the Interstate Commerce Commission, 392 U.S. at 490 n. 8, 88 S.Ct. at 2230, and from the statement in *Blair*, supra, 370 F.2d at 239 that, "Even the producers benefited are not necessarily to be held to account for an ultra vires action taken by the Secretary in what he conceived to be the public interest (footnote omitted)." Nonetheless, I remain convinced that the public interest requires that the passing on defense not be available in this case. As in *Hanover*, recognition of the defense here would tend to discourage those with the greatest stake and most immediate interest in pricing orders from seeking to insure the lawfulness of such orders. Only the ultimate consumer of milk or milk products—persons with precious little stake in a lawsuit and little interest in maintaining a class action—would be relieved of the burden of meeting this defense. The result of such a lowering of incentive for insuring the validity of milk pricing orders through judicial review proceedings would be that those who benefit from unlawfully inflated milk prices "would retain the fruits of [the] illegality because no one was available who would bring suit [against the Secretary]. *Hanover*, supra, 392 U.S. at 494, 88 S.Ct. at 2232. As always, the ultimate burden would fall upon the consumer in the form of higher milk prices.

### *Proof of Damages and the Appropriate Forum for Determining Damages*

While rejecting the passing on defense for the reasons stated in the previous section of this opinion, I find merit in a second argument advanced by the Secretary respecting proof of damages.[13] As noted pre-

---

S.Ct. 443, 78 L.Ed. 859 (1934), in attempting to distinguish this case from those cited in the text is misplaced. *Anniston* and *Jefferson* were decided under *statutes which required recognition* of the "passing on" defense.

**12.** The intervenors contend that Abbotts has not shown that it did not have cost-plus contracts with its customers. While such an arrangement seems unlikely, the intervenors will be free to develop this issue at the hearing on damages before the Secretary.

**13.** Although the Secretary has not pressed the point at this stage of the case, on the motion for reconsideration he also had asserted that awarding damages to Abbotts would give it an unfair advantage over other handlers. The short answer to this argument, of course, is that other handlers had the same opportunity

viously, the price set by the Secretary is only the minimum price which producers must obtain for their milk. The Secretary contends that Abbotts has not proved that it would have been able to obtain milk at the price it was willing to pay, i. e., the price established under the bracketed system proposed but not adopted at the June, 1969, hearing. In essence, the Secretary seems to be saying that Delaware Valley farmers may have refused to sell to Abbotts at the proposed bracketed price upon which it bases its damage claim. Whether the farmers could have done so would depend, of course, on their economic strength in the marketplace compared to that of Abbotts and other handlers.

■ Abbotts contends that the record already contains sufficient evidence upon which the court can conclude that Delaware Valley farmers would have supplied Abbotts with its normal requirements of milk at the price it was willing to pay. In particular Abbotts relies on the fact that, unlike some areas of the country where milk is sold at a "premium" above the order price, the tradition in the Northeast (including the Delaware Valley) with rare exceptions, always has been that milk is sold at the minimum price set by the Secretary. Reliance is also placed on the fact that the bracketed price upon which Abbotts computes its damages was proposed by the major farmer representative in the market, Interstate Milk Producers, and the fact that Abbotts was able to obtain milk at such price before being ordered by Judge Luongo to pay the higher order price. While these factors are strong evidence that Abbotts would have been able to obtain milk at the proposed bracketed price and therefore was damaged by being forced to pay the higher order price, I believe a resolution of this matter must be supported by specific factual findings which can only be made upon a more fully developed record.[14]

Having concluded that determination of Abbotts' damages will require additional factual development and findings, the next question is which forum—this court or the Agriculture Department's Judicial Officer—should conduct such proceedings. Abbotts' argument that this court is the appropriate forum is premised upon its contention that upon the present record, without more, it is entitled to damages measured by the order price-proposed bracketed price differential. If that were the case the computation of damages would entail merely a simple mathematical computation and I would agree that this court is the appropriate forum. See *Fairmont*, supra, 442 F.2d at 773. However, I conclude that further evidence must be presented on the damage question before it can be determined whether and to what extent plaintiff suffered actual loss as a result of the illegal order. The determination of whether Abbotts would have been able to obtain an adequate supply of milk at the proposed bracketed price, and, if not, at what price an adequate supply of milk would have been available to it obviously will require evaluation of complex economic relationships between producers and handlers during the time period for which damages are sought. Such matters are peculiarly within the special expertise of the Secretary and therefore I conclude that this case must be remanded to him for ascertainment of what, if any, damages Abbotts is entitled to recover.

*Interest*

Abbotts also seeks interest at the rate of 9% dating from August, 1970, on whatever amount of damages it may be awarded. Since the case must be remanded to the Secretary anyway, I leave it to him to determine in the first instance the appropri-

---

as Abbotts to challenge the Secretary's decision. The fact that they chose not to do so is no reason for refusing relief to Abbotts.

14. For example, the Secretary suggests that Delaware Valley producers might have been able to sell their milk in other metropolitan areas along the eastern seaboard at prices high-

er than Abbotts was willing to pay. See Forest Affidavit at 2. Another possibility is that producers might have "dumped" their milk rather than sell at prices lower than they believed desireable. All of these possibilities will have to be taken into consideration by the Secretary.

ateness of allowing interest on Abbotts' claim, the rate of interest, and the date from which it should be computed.

### Conclusion

In view of the fact that the last time I returned this case to the Secretary he considered matters far beyond the scope of my order, I wish to make perfectly clear the limited scope of the duties to be undertaken this time. The purpose of the instant remand is to have the Secretary determine upon an appropriately developed factual record whether Abbotts sustained loss by being forced to pay a higher price for milk under the invalid order than it would otherwise have had to pay and to determine if Abbotts is entitled to interest on any damages it might be awarded. In carrying out this function it is not open to the Secretary to reconsider matters that have already been determined by this court in this or prior decisions (e. g., the invalidity of the Secretary's pricing order, the unavailability of the passing on defense, etc.). The maximum principal amount of damages which Abbotts may be awarded is $166,536.45 computed as shown earlier, since that is the maximum amount it has asked for. If the Secretary determines that Abbotts would have been able to obtain its normal supply of milk at the proposed bracketed price for the period from September, 1969, through July, 1970, he should award Abbotts the principal amount of $166,536.45. If, on the other hand, the Secretary determines that market conditions would have forced Abbotts to pay some higher price for milk during the relevant period then he must determine what that price would have been, and (assuming the price would have been less than the invalid order price) compute damages on that basis for the period in question. Finally, if he determines that Abbotts is entitled to some damages, the Secretary must determine whether interest should be awarded, the rate of interest, and the date from which it is to be computed. An appropriate order will enter.