521 F.2d 298
 172 U.S.App.D.C. 198
 John E. MOSS et al., Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Northwest Airlines, Inc., American Airlines, Inc., Trans
World Airlines, Inc., Continental Air Lines, Inc., Eastern
Air Lines, Inc., Delta Air Lines, Inc., Keith Roberts,
Allegheny Airlines, Inc., and North Central Airlines, Inc.,
United AirLines, Inc., Western Air Lines, Inc., Hughes
Airwest et al., Braniff Airways,Inc., and National Airlines,
Inc., Intervenors.
Keith ROBERTS, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
American Airlines, Inc., Northwest Airlines, Inc.,
Continental Air Lines,Inc., Eastern Air Lines, Inc., Delta
Air Lines, Inc., Allegheny Airlines, Inc.,and North Central
Airlines, Inc., United Air Lines, Inc., Hughes
Airwest,Frontier, et al.,Trans World Airlines, Inc.,
National Airlines, Inc., and Braniff Airways, Inc.,Intervenors.
 Nos. 73-1772, 73-1790.
 United States Court of Appeals,
District of Columbia Circuit.
 Oct. 16, 1975.
 
 H. David Rosenbloom, Washington, D. C., with whom Stanford G. Ross and Ronald B. Lewis, Washington, D. C., were on the brief, for petitioners in No. 73-1772.
 William M. Brinton, San Francisco, Cal., for petitioners in No. 73-1790 and intervenor Keith Roberts in No. 73-1772.
 Alan R. Demby, Atty., Civil Aeronautics Board, with whom Thomas J. Heye, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel and Glen M. Bendixsen, Associate Gen. Counsel, Civil Aeronautics Board, were on the brief, for respondent. Howard E. Shapiro, Atty., Dept. of Justice, also entered an appearance for respondent. Richard Littell, Gen. Counsel, Civil Aeronautics Board at the time the record was filed and Howard E. Shapiro, Atty., Dept. of Justice, Robert L. Toomey, Atty., Civil Aeronautics Board entered appearances for respondent.
 J. William Doolittle, Washington, D. C., with whom Alfred V. J. Prather, Washington, D. C., was on the brief, for intervenors American Airlines, Inc., Eastern Air Lines, Inc., Trans World Airlines, Inc., and United Air Lines, Inc.
 Ronald D. Eastman, Washington, D. C., with whom Harold E. Mesirow, Washington, D. C., was on the brief for intervenors Braniff Airways, Inc., Continental Air Lines, Inc., Delta Air Lines, Inc., National Airlines, Inc., Northwest Airlines, Inc., and Western Air Lines, Inc., James W. Callison, Atlanta, Ga., and Robert Reed Gray, Washington, D. C., also entered appearances for intervenor Delta Air Lines, Inc. Gerald P. O'Grady and Ernest T. Kaufmann, Los Angeles, Cal., also entered appearances for Western Air Lines, Inc.
 William C. Burt, Washington, D. C., was on the brief for intervenors Allegheny Airlines, Frontier Airlines, Hughes Airwest, North Central Airlines, Ozark Air Lines, Piedmont Aviation, Southern Airways and Texas International Airlines. James L. Devall, Washington, D. C., entered an appearance for intervenor Allegheny Airlines, Inc. and North Central Airlines, Inc. John W. Simpson, Washington, D. C., entered an appearance for intervenors Hughes Airwest, et al.
 Before J. EDWARD LUMBARD,* Senior Circuit Judge for the Second Circuit, and McGOWAN and ROBINSON, Circuit Judges.
 McGOWAN, Circuit Judge:
 
 
 1
 This case comes in the aftermath of Moss v. CAB, 139 U.S.App.D.C. 150, 430 F.2d 891 (1970), which invalidated certain airline passenger fares made effective by the Civil Aeronautics Board in violation of Section 1002 of the Federal Aviation Act. 49 U.S.C. § 1482 (1970). The question now is whether there is to be a recovery of any part of those unlawful fares. The Board has denied such relief on the grounds that the fares in question were not unjust or unreasonable, and, in any case, resulted in no unjust enrichment of the airlines. We conclude that these decisional principles are determinative, and that they were correctly applied. Accordingly, we affirm.[1]
 
 
 2
 * The history of this case is quite involved, and may best be set out chronologically:
 
 
 3
 August 20, 1969. Petitioners Moss, et al., requested the Board to suspend a number of proposed fare increases claimed by the airlines to be necessary to offset sharp inflation in their costs and decline in their revenues. Petitioners called at the same time for a rulemaking proceeding in which the Board would undertake a general review of its ratemaking practices.September 12, 1969. The Board issued Order 69-9-68, in which it suspended the proposed rates. Recognizing an urgent need for some additional revenue, however, the Board in the same order identified a formula by which the airlines could compute rate increases that would not be suspended. Rate increases of approximately six percent, as contemplated by the formula, were filed and became effective as of October 1, 1969.
 
 
 4
 January 29, 1970. The Board instituted its Domestic Passenger Fare Investigation, a broad inquiry into various aspects of airline ratemaking. The DPFI was later divided into nine separate phases: (1) aircraft depreciation; (2) leased aircraft; (3) deferred federal income taxes; (4) joint fares; (5) discount fares; (6) seating configurations and load factors (subsequently made the subjects of separate phases 6A and 6B, respectively); (7) fare levels; (8) rate of return; and (9) fare structure.
 
 
 5
 June 19, 1970. The Board announced its intention to allow the airlines to "round up" their October 1, 1969 fares to the nearest dollar. The increase took effect July 1, 1970, and yielded some $50 million in additional airline revenues.
 
 
 6
 July 9, 1970. This court rendered its decision in Moss I, invalidating Order 69-9-68 and holding unlawful the fares computed and charged pursuant to it. It was held that the Board had "determined" rates within the meaning of Section 1002(d) and (e) of the Federal Aviation Act, 49 U.S.C. § 1482(d) and (e) (1970), without complying with the requirements of those sections that this be done after notice and hearing, and by reference to statutory ratemaking criteria. The case was remanded to the Board for further proceedings consistent with the court's opinion.
 
 
 7
 July 28, 1970. The Board continued the rounded-up October 1, 1969, fares in effect, declaring that these were the only ones that could be lawfully charged pending establishment of new fares. Order 70-7-128. It called in the same order for carrier filings of new fares to be effective October 15, 1969, such fares to be "free of any compulsion that may have been inherent in the invalid Order 69-9-68."
 
 
 8
 July 29, 1970. The Board moved this court for a stay of its mandate in Moss I for ninety days to permit establishment of new fares in the manner described above. The stay was granted.
 
 
 9
 September 24, 1970. The Board suspended all new fares filed pursuant to its July 28 order, except those that re-established the rounded-up October 1, 1969, fares. These newly filed, though unchanged, fares were, in the Board's view, free of any compulsion from the order invalidated in Moss I.
 
 
 10
 October 7, 1970. Petitioners requested this court to stay its mandate in Moss I for a further period, and thus to express its disapproval of the manner in which the Board had re-established the rates. We were further requested to order the Board to rule promptly on petitioners' request for relief from the fares held unlawful in Moss I. Both requests were denied.
 
 
 11
 February 25, 1971. The Board initiated proceedings to determine whether the rates charged between October 1, 1969, and October 15, 1970, were "unjust and unreasonable." The Board noted the pendency of a number of class actions brought in district courts against the airlines for recovery of part of the fares ruled unlawful in Moss I. On February 19, 1971, these cases had been transferred by the Judicial Panel for Multidistrict Litigation to the United States District Court for the Northern District of Illinois. In re Air Fare Litigation, 322 F.Supp. 1013 (Jud.Pan.Mult.Lit., 1971). Partly in order to aid the Northern District of Illinois to resolve these suits, the Board deferred decision of the question of whether it had power to grant relief, and proceeded directly to the question of the reasonableness of the challenged fares. The class action suits were in fact stayed pending the Board's resolution of that question, Weidberg v. American Airlines, 336 F.Supp. 407 (N.D.Ill., 1972), and the suits were subsequently dismissed on the basis of the Board order now under review. Weidberg v. American Airlines, No. 70 C 1879 (N.D.Ill., filed Dec. 10, 1973).
 
 
 12
 April 9, 1971. The Board issued its final decision in Phase 6B of the DPFI (load factors), and its tentative findings and conclusions in Phase 7 of the DPFI (fare levels). The latter proposed a fare level 12% Higher then the unlawful October 1, 1969 rates. After taking interim adjustments into account, this higher level required an increase of 9% In the then prevailing rates. The Board authorized an increase of 6% Pending its final decision in Phase 7. (The Board's final decision, affirming its tentative one, came on August 11, 1973.)
 
 
 13
 May 7, 1971. Fare increases of 6%, as provided for in the Board's April 9 orders, went into effect. The lawfulness of these rates has not been challenged by petitioners.
 
 
 14
 July 11, 1973. The Board issued Order 73-7-39, its final decision denying relief from the rates found by this court in Moss I to have been unlawfully "determined."
 
 
 15
 July 16, 1973. Petitioners sought direct review in this court of Order 73-7-39.
 
 
 16
 The foregoing is an account of three sets of interrelated proceedings before the Board, dealing with (1) the establishment of lawful fares in place of those found unlawful in Moss I, (2) the propriety of relief for the public from those unlawful rates, and (3) the general matter of how rates were properly to be set in the future. Since petitioners claim that lawful fares were not re-established until May 7, 1971, they seek relief from rates charged during the period running from that date back to October 1, 1969.[2] This attempt to establish the unreasonableness of rates charged during that period rests largely on the retroactive application of standards set in the DPFI.
 
 
 17
 During the period in which the October 1, 1969, rates were charged, the airlines did not in fact earn excessive profits from their passenger operations. The average rate of return on such operations for the year ending September 30, 1970, was found by the trial examiner to have been 3.29 percent in the case of the trunk line carriers, and -.40 percent in the case of the local carriers.[3] Petitioners do not challenge these findings. A fair and reasonable rate of return had been established by the Board in 1960 in its General Passenger Fare Investigation at 10.5 percent. This was increased in Phase 7 of the DPFI, concluded in 1971, to 12 percent for the trunk lines and 12.35 percent for the locals. Assuming, as the Board did, that a fair rate of return for the period in question lay somewhere between these two figures, plainly it was not achieved. The poor performance was nothing new. A return as high as 10 percent had been achieved by the trunk lines during only two of the ten years prior to 1970, the average for that decade being 6.2 percent. App. 522.
 
 
 18
 Petitioners argue, however, that the absence of excessive operating profits is not dispositive. They have instead made the following claims:
 
 
 19
 (1) The right to recover passenger fares is not dependent on their having been "unreasonable," but solely on their having exceeded the last preceding rates that were lawfully established (I. e., the pre-October 1, 1969, rates).
 
 
 20
 (2) Even if recovery of unlawfully established rates is to be had only to the extent that they exceeded what was "reasonable," such an excess existed here because
 
 
 21
 (a) the rate of return for the period in question should be recomputed on the assumption that the airlines experienced the higher load factors which the Board determined in Phase 6A of the DPFI should be the standard for the future;
 
 
 22
 (b) the rate of return should be recomputed on the assumption that all seats had been sold for full fares, with a reduction or "dilution" on account of discount fares only to the extent of 12 percent, this figure being regarded by petitioners as reasonable in light of the Board's determination in Phase 5 of the DPFI that future fare levels would be constructed on the assumption that no discounts were offered at all;
 
 
 23
 (c) the airlines' "indirect" costs (those not directly associated with the operation of aircraft) should be limited to 48.4 percent of total costs, this standard also being one that was allegedly adopted in the DPFI.
 
 
 24
 (3) Even if the general fare level did not yield profits which, as properly recomputed, were "unreasonable," recovery should be had by those who paid unjustly discriminatory rates during the period in question.
 
 
 25
 The Board gave varied responses to these claims.[4] The first claim that for a refund of all amounts charged in excess of pre-October 1, 1969, rates the Board dismissed on the basis of contrary court decisions. The second set of claims those attempting to establish the unreasonableness of charged rates by the retroactive application of standards adopted in the DPFI the Board turned aside in two ways. It found in some instances that the fares were not unreasonable even if tested by the appropriate rate making standards. In other instances, however, it declined to apply those standards retroactively because doing so would be "inequitable." The Board's response to the third claim that based on fare structure was cast even more clearly in terms of the equity of recovery rather than the propriety of the fares.
 
 II
 
 26
 There are a number of vexing questions presented by this appeal. Is there Any right of recovery for previously charged and properly filed airline fares?[5] If so, who may grant it: the Board, this court, a district court, or some combination?[6] And what is the standard of recovery, assuming it is the same in the various forums which may grant it? We need only address the last of these questions, for we find that the proper standard for recovery is such as to preclude relief to these petitioners in any forum at least at this stage of the proceedings.
 
 
 27
 As there is scant precedent for the granting or denial of recovery of unlawful airline fares,[7] we begin with a brief review of the problem as it has arisen in analogous regulatory contexts.
 
 
 28
 (a) Interstate Commerce Commission.
 
 
 29
 Part I of the Interstate Commerce Act explicitly imposes upon subject rail carriers a liability, enforceable either before the ICC or in a district court, for violation of the Act's commands, among them that just, reasonable, and nondiscriminatory rates be charged.[8] The standard of recovery is, of course, justness and reasonableness, a matter within the Commission's primary jurisdiction.[9] There is no comparable right of recovery expressly given by the Federal Aviation Act for unlawful airline rates. Still, there is at least one railroad rate case that is highly relevant to our problem. In Atlantic Coast Line R.R. v. Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935), recovery was sought of rate increases which the Commission had itself ordered into effect, assertedly to prevent a discrimination against interstate commerce. The Commission's order was judicially reversed for lack of adequate factual findings. The Commission subsequently issued new and more ample findings, re-established exactly the same rates, and was this time upheld in the courts. In these circumstances, the Commission was thought to be "without power to give reparation" for the improperly established rates. 295 U.S. at 312, 55 S.Ct. 713. The ratepayers' only remedy was for restitution, which Justice Cardozo described as follows:
 
 
 30
 A cause of action for restitution is a type of the broader cause of action for money had and received, a remedy which is equitable in origin and function. . . . The claimant to prevail must show that the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it.
 
 
 31
 Id. at 309, 55 S.Ct. at 716. In concluding that equity required no restitution not even the partial restitution the lower court had granted the Court relied primarily on the fact that following its earlier reversal the Commission had made new and procedurally adequate findings that the invalidated rates had in fact been just and reasonable.[10]
 
 
 32
 Interstate motor carriers are now subject to the same express statutory liability for unreasonable rates as are the railroads.[11] Prior to 1965, however, the Commission was, with respect to motor carriers, in the same position as the Board lacking any express reparation or refund power. That lack was held by the Supreme Court in T.I.M.E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), to preclude recovery by the payers of unreasonable motor carrier rates, at least where the claim was made by way of a defense in an action by the carrier to collect rates which had been properly filed with, and not challenged before, the Commission. Three years later, however, in Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc., 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962), the Court held, over the objection of T.I.M.E.'s author (Harlan, J.), that common law remedies against common carriers could survive the enactment of the statute so long as they were consistent with its regulatory scheme. Such a surviving remedy was that for misrouting of a shipper's goods, on which ground the plaintiff in Hewitt-Robins in fact prevailed.
 
 
 33
 (B) Federal Power Commission.
 
 
 34
 The only express reference to recovery of excessive rates in the Natural Gas and Federal Power Acts is in connection with the exercise by the FPC of its power to suspend rates for five months pending their investigation. See 15 U.S.C. § 717c(e), 16 U.S.C. § 824d(e) (1970). Suspended rates may go into effect after that period if the investigation is incomplete, but if they are later finally determined to be excessive, the Commission has power to order their refund. Recovery is for the excess of charged rates over what was just and reasonable, with the price specified in a seller's certificate of convenience and necessity serving as a "refund floor." See FPC v. Sunray DX Oil Co., 391 U.S. 9, 23-24, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968).[12] Refunds may also be ordered by way of the FPC's conditioning the certification of natural gas sales on the refunding of excessive rates that have previously been charged, either under a temporary, unconditioned certificate, see, e. g., Continental Oil Co. v. FPC, 378 F.2d 510, 530-32 (5th Cir. 1967), cert. denied, 391 U.S. 917-19, 88 S.Ct. 1801, 20 L.Ed.2d 655 (1968), or under a permanent, unconditioned certificate that has subsequently been invalidated in the courts. See, e. g., United Gas Improvement Co. v. Callery Properties, 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965). Such refunds would again be limited to the excess of actual over reasonable charges, and might be even less, since "the issue of a refund in (such) circumstances turns upon equitable considerations." Public Service Commission of New York v. FPC, 117 U.S.App.D.C. 287, 329 F.2d 242, 249-50, cert. denied sub nom. Prado Oil & Gas Co. v. FPC, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964).[13](C) Metropolitan Area Transit Commission.
 
 
 35
 A third area in which this court in particular has confronted the problem of public recovery of unlawful rates is in connection with the Washington Metropolitan Area Transit Commission, which for a time oversaw the operations of an independent D. C. Transit company under a multistate Compact between the District of Columbia, Maryland and Virginia.[14] The Compact required the Commission to establish, and Transit to charge, just and reasonable rates. There was no provision for recovery or refund of excessive rates.[15] Nonetheless, we held in Bebchick v. Public Utilities Commission, 115 U.S.App.D.C. 216, 318 F.2d 187, 203-04, cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963), that where the Commission had improperly authorized a fare increase, the amount realized could not be retained by the company, and even if it could not be directly refunded, had somehow to be "utilized for the benefit of the class who paid it." In Williams v. Washington Metropolitan Area Transit Commission, 134 U.S.App.D.C. 342, 415 F.2d 922 (1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969), we were more explicit about the nature and measurement of the public recovery in such a case. Such recovery was held to be "governed by the equitable considerations which apply to suits for restitution generally." We found that in the circumstances of that case these principles required Transit to "restore the amount realized by the fare increase only to the extent that its actual return is not reduced to an amount which all parties have agreed would be unreasonably low." Id. at 944-46. In Democratic Central Committee of D. C. v. Washington Metropolitan Area Transit Commission, 158 U.S.App.D.C. 107, 485 F.2d 886, 913-15 (1973), cert. denied, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974), we again invalidated a Commission-authorized rate increase. Once again we found "the appropriate avenue of relief . . . to be restitution," though in this instance we remanded the case to the Commission for its consideration of what exactly should be restored.
 
 
 36
 (D) United States v. Morgan.
 
 
 37
 We take note, finally, of United States v. Morgan, 307 U.S. 183, 191-98, 59 S.Ct. 795, 83 L.Ed. 1211 (1939), involving an order of the Secretary of Agriculture reducing stockyard rates to a just and reasonable level. The order was stayed pending judicial review, but the amount by which, if valid, it would reduce the stockyard owners' receipts was ordered paid into court. The Secretary's order was invalidated on procedural grounds, and the Court faced the question of the fund's disposition. The district court was instructed to proceed "in conformity to equitable principles," and primarily on the basis of what the Secretary subsequently determined to have been the just and reasonable rates for the period.[16]
 
 
 38
 The foregoing brief survey suggests that if there is a remedy for properly filed airline rates later found to be unlawful, it is of one of the following kinds: a surviving common law (or conceivably an implied statutory) remedy for unreasonable charges by a common carrier (analogous to that recognized in Hewitt-Robins, Supra ); a right to seek the exercise by the CAB of its power to condition certificates of convenience and necessity on the refunding of more-than-reasonable fares (analogous to that recognized in Continental Oil and Callery, supra ); or a right to have the CAB or the courts order the restitution of amounts collected by virtue of erroneous orders or judgments (by analogy to Atlantic Coast Line, Morgan, and this court's Transit Company cases).
 
 
 39
 One right which clearly does not exist is the one petitioners claim for recovery of all amounts in excess of the last lawfully established rates. To cite only the most prominent contrary authority, the Supreme Court in Atlantic Coast Line expressly rejected the suggestion that where a rate order was procedurally defective the carriers should restore the excess over the last lawfully established rate, and thus "pay the price of the blunders of the commerce board." 295 U.S. at 314, 55 S.Ct. at 718. Significantly, the dissenters in that case would have granted just the recovery that petitioners now seek. See id. at 318-30, 55 S.Ct. 713.[17] Our holdings in Williams v. Washington Metropolitan Area Transit Commission, 134 U.S.App.D.C. 342, 415 F.2d 922 (1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969), and Democratic Central Committee of D. C. v. Washington Metropolitan Area Transit Commission, 158 U.S.App.D.C. 107, 485 F.2d 886 (1973), cert. denied, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974), both discussed supra, are also inconsistent with petitioners' claim.
 
 
 40
 We find no support for petitioners' "last lawful rate" theory in the two cases on which they primarily rely, Middlewest Motor Freight Bureau v. United States, 433 F.2d 212 (6th Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971), and Chicago, Milwaukee, St. P. & P. R.R. v. Alouette Peat Products, 253 F.2d 449 (9th Cir. 1957). The former is a case in which the last lawfully established rate happened also to be the just and reasonable one. An ICC order cancelling a proposed rate increase had been stayed pending review. When the stay was later lifted, recovery was sought of the amounts which, because of the stay, were charged in violation of the ICC's by-then-vindicated cancellation order. The rate-payers prevailed, not because the lower rates were the last lawfully established rates, but because the Commission had correctly found that they were the highest rates that could justly and reasonably be charged. See 433 F.2d at 229-32. Alouette is distinguishable as a case in which the full amount of a rate increase was restored, even though at least part of that increase appeared just and reasonable, because the increased rates were not properly on file with the Commission.[18] We have not discussed the matter of "overcharges," or charges in excess of properly filed rates. Manifestly, the case for a strict rule of recovery is far stronger in that context.[19]
 
 
 41
 We have concluded that the Board correctly focused on the equity of restitution and not just the reasonableness of past rates. Reasonable rates, in this regulated industry as in others, are those which are as low as possible but still allow the industry to provide "adequate and efficient service" and earn a reasonable rate of return, thus assuring its ability to attract necessary capital in the future. The just and reasonable rate, in short, is the rate at which, under a given set of economic circumstances, the industry will perform efficiently as that term is defined by the statute.
 
 
 42
 There are distinct equitable considerations which may prevent a recovery even where fares had been found to exceed what was just and reasonable. It might be thought, to take the facts of our case as an example, that the reasonable rate for a past period was one which paid for a far more modest service than was actually provided, but that since a lavish service was in fact provided, with apparent Board blessings, there is no equity in extracting profits which never existed. Other circumstances can be imagined which might have already denied the airlines the fruits of their unreasonable prices, and thus make it inequitable to require them to be disgorged. The excessiveness of prices, perhaps in combination with an unexpected economic downturn, might itself have caused a ruinous decline in the volume of air travel, with consequent losses to the airlines. Even if excessive profits were made in a given period, there may be inequity in trying to recover them, particularly if large classes of people are involved. As to who receives relief, it may be impossible to reimburse those who actually paid the unreasonable rates, so that the best that can be done is to establish a fund on the carrier's books to be applied for the benefit of future fare-payers.[20] As to who provides relief, past stockholders may have reaped the benefits of the unreasonable fares and departed the scene, leaving future stockholders to be adversely affected by the recovery. The bite which is effectively taken from future earnings by a recovery fund may in turn impair the health of the industry, to the disadvantage of the fare-payers themselves.
 
 
 43
 The facts of our case are illustrative. The excessive profits sought to be recovered were not in fact earned but must be hypothesized by a recomputation of costs and revenues. A substantial fare-payer recovery on this theory would in practical effect mean that an airline industry which had performed badly in the past (from the investors' point of view) would be all the more likely to perform badly in the future. The equitable aspects of refunding past rates are as inextricably entwined with the Board's normal regulatory responsibility, as such refunds may substantially affect the future rates, performance, and health of the industry. The statutory scheme thus seems to require that the Board pass in the first instance not only on the reasonableness of past rates, but on the equity of any recovery where such rates are found to have been unreasonable. Cf. Democratic Central Committee of D. C. v. Washington Metropolitan Area Transit Commission, 158 U.S.App.D.C. 107, 485 F.2d 886 (1973), cert. denied, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974).
 
 III
 
 44
 The Board's approach to its task of determining whether the airlines had been unjustly enriched was to look first at their actual rate of return during the period in question, calling this "the best overall index of the reasonableness . . . of passenger fares," App. 501, and upon finding it inadequate, as it undisputedly was, to assess petitioners' specific arguments as to why and how that rate of return should be readjusted. We turn now to those arguments.
 
 
 45
 (A) Load Factors.
 
 
 46
 A load factor is simply an expression of how full airplanes are. It is the ratio of the number of miles flown during a given period by revenue-paying passengers, to the number that could have been flown had every available seat been filled. Before 1971, it had been the Board's practice to accept for ratemaking purposes the load factors that the airlines actually experienced, i. e., to determine revenue needs and the fares necessary to meet them on the assumption that the flights an airline proposed to offer would be only as full as past experience suggested. In 1971, however, the Board came to the conclusion in Phase 6B of its DPFI that this policy had fostered overcapacity in the industry. Barred from price competition, the airlines vied for the available traffic by scheduling more and more flights, which were more and more empty and required higher and higher fares to pay for them. The higher prices depressed the volume of air travel, further aggravating the overcapacity problem. To break the cycle the Board proposed standard load factors which would in the future be assumed when calculating the revenue that a proposed flight would generate. Actual load factors would of course vary, but by making rates with reference to the assumed factors the Board would insure that earnings, rather than fares, would fluctuate with load factors. The airlines would thus have a strong incentive to reduce overcapacity. See generally Order 71-4-54; App. 182.
 
 
 47
 The last point is critical. The Board disavowed any intent in adopting the load factor standards to force the airlines into particular scheduling molds. Its purpose was to force an adjustment by the airlines to its new load factor constraints, but exactly what the adjustment would be, the airlines themselves were to decide. Id. at 190. The policy was thus entirely prospective in nature, as is borne out by the Board's adoption, for the trunklines, of an interim standard substantially lower than that to which it would hold the airlines in the long run.
 
 
 48
 The long run factors adopted by the Board were 55 percent for the trunklines, 44.4 percent for the local lines, and 54.1 percent for the industry as a whole; the interim trunkline factor was 52.5 percent.[21] During the period in which the challenged rates were charged, the trunk airlines actually experienced a load factor of only 48.9 percent, and the locals one of 43.2 percent.[22] Petitioners would recalculate the airlines' earnings on the basis of the 54.1 percent figure.[23]
 
 
 49
 The Board's answer was, first, to entertain for the trunklines only the interim factor as a possible basis for retroactively computing reasonable rates. Petitioners' contention, that the higher, permanent factor must be applied to the earlier period, appears to rest on the assumption that that figure represents an ideal load factor then and now. They overlook the fact that one of the circumstances of which a regulatory agency may take account is past regulation. The Board's own past policies of restricting price competition and allowing service competition to flourish may be partly to blame for overcapacity in the industry. However the airlines came to their present pass, it was the Board's obligation to bring them through it with a minimum of disruption. In short, what is just and reasonable encompasses not only what is ideal, but what approaches it in an orderly and reasonable fashion. Hence the interim standard. Under the circumstances the Board might well have abused its discretion had it ignored that standard in favor of the permanent one.
 
 
 50
 The Board expressed doubt as to the reasonableness or at least the equitableness of applying even the 52.5 percent figure retroactively. It also found, however, that a 52.5 percent load factor produced a rate of return of only 6.13 percent for the trunklines, while a 44.4 percent factor produced a .65 percent return for the local carriers.[24] Neither earned unreasonable rates of return, therefore, even if the appropriate load factors were applied retroactively. We have seen no plausible attack on this calculation, or on the inadequacy of the rate of return which it yields. We uphold the Board in its conclusion that thus far no unreasonableness had been established.[25]
 
 
 51
 (B) Dilution.
 
 
 52
 The term refers to the loss of revenues, expressed as a percentage, from selling seats at less than full fares. There are any number of ways in which such sales are made youth fares, military fares, family fares, excursion fares, standbys, and so on. Such discount fares work an obvious discrimination against full fare passengers and are therefore facially inconsistent with "rule of equality" contained in § 404(b) of the Federal Aviation Act, 49 U.S.C. § 1374(b) (1970). They have nonetheless been tolerated by the Board on the theory that they could benefit the full fare passenger, first, by stimulating new and increased demand, and thus paving the way for long run economies of scale (E. g., larger, more economical aircraft); and, second, by filling seats that would otherwise be empty, and thus allowing the full fare passenger to subsidize those seats partly rather than fully.[26]
 
 
 53
 On such reasoning the Board in 1965 approved the use of military standby and youth standby and reservation fares.[27] On review the Fifth Circuit remanded the matter of the youth fares for further consideration, see Transcontinental Bus System, Inc. v. CAB, 383 F.2d 466 (5th Cir. 1967), cert. denied, 390 U.S. 920, 88 S.Ct. 850, 19 L.Ed.2d 979 (1968). Such consideration ultimately took the form of Phase 5 of the DPFI, in which a number of discount fares were re-evaluated. Some of these the courts had ordered the Board to reconsider (E. g., family fares, see Trailways of New England, Inc. v. CAB, 412 F.2d 926 (1st Cir. 1969)), and some it had not, but all had apparently had the Board's previous approval. See Order No. 70-12-18; App. 537-39.
 
 
 54
 The Board in Phase 5 concluded that in general the bases on which the discriminatory discount fares had been justified were not sound. Little additional traffic had been generated, and the potential cost savings to be realized from traffic increases were found to be slight in any event. More important, the fares were not filling seats that would otherwise be empty; instead, new capacity was being added to accommodate the discount passengers. In essence the Board recognized that it was facing another aspect of the same problem that concerned it in DPFI Phase 6B dealing with load factors: If the airlines, barred from price competition, tended to compete by increasing their capacity, and if this tendency was made chronic by their ability to pass the cost of overcapacity along to the fare-payers, it did not help to allow the airlines to discriminate among those fare-payers; indeed, it only made matters worse for those discriminated against. Put another way, a limitation on dilution is a necessary complement of the load factor standards, for the burden of overcapacity on the full fare passenger is not substantially lessened if, while requiring that only 45 percent of an average flight's seats be empty, the Board allows another 20 percent (let us say) to be half empty in the sense of being filled by passengers who do not pay full fares.
 
 
 55
 The Board therefore resolved in Phase 5 to tolerate only certain kinds of discounts which were shown to have the potential of enhancing an airline's short run profits, i. e., for filling flights that were already scheduled to fly and would otherwise fly empty. To insure that the discounts would not remain in effect, and become a burden on the full-fare passenger in the way we have described, the Board limited the duration of the discounts to eighteen months, and also announced a powerful disincentive to their use, namely, it would in future fare proceedings assume zero dilution. It would assume, in other words, that all seats were sold for full fares.[28]
 
 
 56
 It is on this basis that petitioners insist that the airlines' revenues for the period in question be recomputed to allow a dilution of only 12 percent of what full fare receipts would have been. The 12 percent figure was proposed by their sole expert witness, who testified that discount traffic accounting for smaller amounts of dilution tended to be carried by existing capacity, but that when such traffic took a larger bite from revenues, it tended to be accommodated by capacity increases.
 
 
 57
 The Board responded in several ways. It stated that there was no evidence to support the 12 percent figure (as indeed there appears to be none[29]), and that a percentage standard was in any case "faulty in concept" (as appears to be true, the effect of a discount upon capacity being much more a matter of its timing than the amount of traffic it generates).[30] We may assume, without deciding, that these attacks on petitioners' proposed dilution standard would be inadequate without some consideration by the Board of whether some other standard would be more acceptable. In the event, the Board went on to reject the retroactive application of any dilution standard. It stated that the dilution policy of Phase 5
 
 
 58
 was intended to provide the carriers with an "incentive to make sound pricing decisions which will take into account both the long-term and short-term factors." Manifestly, this policy was designed to provide incentives for the future, and was not intended to be applied retroactively.
 
 
 59
 Board Decision at 25; App. 757.
 
 
 60
 While this appears to represent a conclusion by the Board that the computation of just and reasonable rates for the period in question need not incorporate a limit on the use of discount fares, that conclusion was clearly alloyed with a concern over the inequity of a retroactive dilution adjustment. The sentences quoted above were followed in the Board opinion by its statement that "(f)or the reasons previously given, such a retroactive application would be highly arbitrary and inequitable." Id. (emphasis supplied). The "reasons previously given" included the fact that, up to and including the period in question, the various discounts were approved by the Board.
 
 
 61
 The Board's conclusion that retroactive adjustment for dilution would be "arbitrary and inequitable" seems to us persuasive, particularly when viewed in the broader context of airline ratemaking. The laws of supply and demand operate in the airline industry as elsewhere. Different fare structures and schedules will generate different amounts of traffic, and different rates of return. The number of solutions to the supply-demand equation is infinite. The Board's approach has not been to choose a particular solution, but to impose constraints on the solutions the airlines may choose (I. e., that those solutions must entail a reasonable rate of return, 55 percent full airplanes, no discrimination, etc.). The benefits of innovation and competition are thus to some extent preserved by allowing the airlines to devise their own solutions, and then to out-perform those solutions by operating more efficiently (and more profitably) than had been assumed.
 
 
 62
 In this context it does indeed seem "faulty in concept" to impose a particular ratemaking constraint upon a prior period during which, of course, the private initiative which it was intended to elicit never occurred. And it is certainly inequitable by such retroactivity to deprive the carriers of the chance to make a profit from operations conducted within that constraint. The inequity is greater when inadequate profits were made by the carriers even under the constraints then applicable. Petitioners are in the position of claiming that profits which never existed should be disgorged because they would have existed had the proper regulatory guidelines been in force, when in fact there is no way to know whether such profits would have been earned or not. The Board's rejection of this position as "arbitrary and inequitable" seems to us completely sound.
 
 
 63
 (C) Indirect Costs and Costs Generally.
 
 
 64
 Petitioners also claim that during the period in question the airlines experienced excessive indirect costs, or costs not related to the actual operation of aircraft. The claim has undergone something of an evolution. Before the Commission it was argued that ratemaking standards adopted in the DPFI required that indirect costs for the period be limited to 48.4 percent of direct costs. The Commission pointed out in response that the 48.4 percent figure had been employed in Phase 7 of the DPFI (that concerned with fare levels) solely for the purpose of forecasting indirect costs. In the Commission's words, "(i)t is not a Board standard, nor does it have any relevance to the past period." Board Decision at 19; App. 751. The Board also observed that the indirect costs actually experienced during the period in question amounted to only 47.7 percent of direct costs, so that the airlines did not exceed the limit of 48.4 percent, even assuming it was properly regarded as such.
 
 
 65
 In their brief to this court petitioners appear to accept the Board's disposition of their argument based on the 48.4 percent figure. They now claim that it was not enough for the Board merely to turn that particular argument aside, but that an independent assessment of the reasonableness of carrier costs, direct and indirect, was required. Democratic Central Committee of D.C. v. Washington Metropolitan Area Transit Commission, 158 U.S.App.D.C. 107, 485 F.2d 886 (1973), Cert. denied, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974), is cited for support, and particularly our holding in that case that
 
 
 66
 The Compact placed an obligation upon the Commission to develop the record on important matters when it was unsatisfied with the record produced by the parties. The Commission, like other agencies charged with the protection of the public interest, was not created simply to "provide a forum for the" proceeding.
 
 Id. at 905.[31]
 
 67
 We find no error in the Board's methodology. Democratic Central Committee involved a different statute, a different regulatory agency, and a different regulated industry. As we explained at some length, the transit company was a monopoly, the purpose of regulation was to afford the consumer the benefits of competition, and one of these was efficiency, which non-competitive firms tend not to achieve.
 
 
 68
 The airlines, by contrast, are in many respects highly competitive. Indeed it is partly to hold destructive competition in check that the CAB exists; price competition, for example, is effectively prevented. Other kinds of competition flourish, however. It is on this assumption that the Board accepts industry cost averages for rate making purposes. It is assumed that the carriers will compete to reduce costs below those averages and so make a larger profit.[32] To be sure, the load factor and dilution standards adopted in the DPFI represent efforts by the Board to control costs which competition has failed to control, but the failure derives more from an excess of competition than a dearth of it. The duties of the Board with respect to investigating carrier costs may thus be quite different from those discussed in Democratic Central Committee. They may well be discharged by the Board's simply inquiring into whether the applicable industry-wide cost guidelines of the DPFI have been exceeded.
 
 
 69
 That is what the Board did in this case. It agreed with petitioners that "the reported operating results of the carriers under the fares in question should not be accepted (but) must be adjusted to conform to (DPFI ) standards." It concluded, however, that "the data supplied for this period conform to the Board's conclusions in the DPFI with respect to Treatment of Flight Equipment Depreciation and Residual Values for Rate Purposes, . . . Treatment of Leased Aircraft for Rate Purposes, . . . and Treatment of Deferred Federal Income Taxes for Rate Purposes." Board Decision at 13-14; App. 745-46. The remaining DPFI standards for load factor and dilution were given more extensive consideration, owing to the stress placed on them by petitioners. The Board's cursory discussion of DPFI guidelines on which petitioners placed no emphasis seems to us acceptable under the circumstances. Whereas in Democratic Central Committee we were reviewing a prospective rate making decision of the Commission, we are here reviewing the Board's conclusions as to whether there has been unjust enrichment.[33] At least where this is the question, and where the background to it is a period of low actual profitability for the airlines, the Board need not have given more than summary consideration to arguments the petitioners had not specifically advanced.
 
 
 70
 (D) Discrimination.
 
 
 71
 The claim for recovery on the ground that the fare structure was discriminatory is allied to that based on dilution, but discrimination in favor of the discount passenger is, however, only one of the unjust discriminations alleged to have taken place. Others include discrimination between (1) short and long haul travellers (the latter being allegedly the victims of mileage formulae which did not take account of the higher per mile cost of short flights), (2) travellers using congested and those using non-congested airports (again because mileage formulae did not reflect actual costs), and (3) travellers paying a single or through fare and those who must pay multiple fares (a fixed terminal charge being included in each of the latter).
 
 
 72
 As the Board noted, however, these characteristics of the fare structure had been in lawfully filed and effective tariffs for many years without Board interference. Indeed, the immediate tariffs in question, filed in response to what the Board indicated it would accept, effectively initiated a significant lessening of the discrimination of which petitioners now complain.[34] Thus the fare structure in effect during the period in question was directly responsive to what the Board considered and represented to be lawful. And the carrier, as a practical matter, had no choice but to file the tariffs they did.
 
 
 73
 Where, as here, recovery can only be had in terms of restitution grounded in equitable considerations, the circumstances just described are not such as to mandate recovery; and we leave undisturbed the Board's action in this regard. This conclusion is fortified by, although not dependent upon, the finding that the carriers did not receive excessive and unreasonable returns from the fare level involved here, and that there is no fund of net enrichment from which restitution could appropriately be made. Assuming Arguendo that restitution in respect of discriminatory fares may conceivably be appropriate where a carrier knows or should have known that such fares existed in an otherwise just and reasonable fare level, the facts here do not admit of the attribution to the carrier of the requisite guilty knowledge. The fares in question were charged by the carriers in reasonable reliance on the Board's explicit approval of them. To the extent that the Board was mistaken about the lawfulness of the filing, the consequences of that mistake should not be visited upon the carriers, certainly absent any actual unjust enrichment.
 
 
 74
 The order appealed from is affirmed in all respects.
 
 
 75
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to Title 28, U.S.Code Section 294(d)
 
 
 [1]
 Two petitions for review of the same Board order have been consolidated. The first, No. 73-1772, was filed by Congressman John E. Moss and some twenty-four colleagues. It is they who instituted the Board proceedings culminating in the challenged order, as it was they (or a similar group) who secured the ruling of this court in Moss I. The second petition, No. 73-1790, was filed by Keith Roberts, a plaintiff in one of several district court suits filed after Moss I, in which relief was sought directly against the airlines. Those suits having been continued pending the outcome of the Board proceedings, petitioner Roberts successfully sought to intervene before the Board. In addition to filing his own review petition in this court, Roberts has also intervened in No. 73-1772. Some fourteen airlines have intervened in both appeals, urging that the Board be upheld
 
 
 [2]
 Br. Petitioners at 9. There is dispute among the parties as to when lawful passenger fares were re-established. The intervenors claim, for example, that since petitioners made no attack upon the board's action in allowing newly-filed but unchanged fares to go into effect on October 15, 1970, the latter date marks the end of the period for which relief could be sought, at least with the aid of Moss I. Br. Intervenors Braniff Airways, Et al. at 10. Since we find that petitioners have not yet established their entitlement to relief for any period, we need not resolve this dispute
 
 
 [3]
 Initial Decision of Trial Examiner Ross I. Newmann at 23; App. 504. The figures were derived by use of the so-called "by-product" or "revenue-offset" method of allocating the costs of carrying passengers and belly cargo. By this method the cost of belly cargo is simply equated to the revenue it generates. The trial examiner further found that the more refined "joint product" method, by which the actual (and greater) costs of belly cargo are sought to be identified, yielded similar figures, 4.19 percent and -.13 percent respectively. Initial Decision at 23-24; App. 504-05
 
 
 [4]
 See generally CAB Order No. 73-7-39, July 11, 1973; App. 732
 
 
 [5]
 Compare T.I.M.E., Inc. v. United States, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959) (absence of reparations power in ICC precludes recovery for unreasonable motor carrier rates), With Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc., 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962) (shippers could recover for misrouting by motor carriers). These cases are discussed at greater length below
 
 
 [6]
 All four possibilities are presented in this appeal. The district judge before whom the class actions were consolidated, See, --- U.S.App.D.C. ---, 521 F.2d 301, Supra, apparently assumed that he could grant relief based on a Board finding that the fares in question were unreasonable. 336 F.Supp. 407 (N.D.Ill.1972). The Board itself was of course requested to grant relief. Having failed in that forum, petitioners now urge that we as an appellate court exercise an inherent authority to order restitution ourselves, as ostensibly we did in Williams v. Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. 342, 415 F.2d 922 (1968), Cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969)
 
 
 [7]
 The only precedent known to us is Danna v. Air France, 334 F.Supp. 52 (S.D.N.Y.1971), in which recovery was sought of allegedly discriminatory passenger fares. The district judge dismissed on the ground that T.I.M.E., Inc. v. United States, see note 5 Supra, barred any recovery. The judgment was affirmed, but on the more limited ground that recovery must in any case await a determination by the Board that the fares in question were indeed unlawfully discriminatory. 463 F.2d 407 (2d Cir. 1972)
 
 
 [8]
 49 U.S.C. §§ 1(5), 3(1), 8, 9 (1970). A similar regimen applies to water carriers subject to Part III of the Interstate Commerce Act. See 49 U.S.C. §§ 901 Et seq., 908 (1970)
 
 
 [9]
 Compare Texas & P. Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 448, 27 S.Ct. 350, 358, 51 L.Ed. 553 (1907) ("a shipper seeking reparation predicated upon the unreasonableness of the established rate must, under the act to regulate commerce, primarily invoke the redress through the Interstate Commerce Commission"), With J. C. Famechon Co. v. Northern P. R.R., 23 F.2d 307 (8th Cir. 1927) (primary resort to Commission not necessary where issue is legal construction of filed tariff)
 
 
 [10]
 The existence of a judicial power to restore the fruits of a subsequently invalidated rate order gains further support from Section 74 of the ALI Restatement of the Law of Restitution (1937):
 JUDGMENTS SUBSEQUENTLY REVERSED. A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable or the parties contract that payment is to be final; if the judgment is modified, there is a right to restitution of the excess.
 The existence of such power in regulatory agencies themselves appears to have been recognized by the Supreme Court in United Gas Improvement Co. v. Callery Properties, 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965), where it was stated that "(a)n agency, like a court, can undo what is wrongfully done by virtue of its order."
 
 
 [11]
 See Pub.L. No. 89-170, 79 Stat. 651 (1965), As codified, 49 U.S.C. § 304(a) (1970); Land O'Lakes, Inc. v. United Buckingham Freight Lines, Inc., 351 F.Supp. 102 (D.Minn.1972)
 
 
 [12]
 See also, In re Hugoton-Anadarko Area Rate Case, 466 F.2d 974, 990 (9th Cir. 1972) (refunds could be forgiven by the Commission if they would otherwise treat principal seller "unfairly as compared to the other producers")
 
 
 [13]
 See also Skelly Oil Co. v. FPC, 401 F.2d 726, 729 (10th Cir. 1968) ("no inequity results" where FPC orders refund of rates charged in accord with permanent certificate which was later reconsidered, seller being "on notice that the allowed rate was subject to revision"); Plaquemines Oil & Gas Co. v. FPC, 146 U.S.App.D.C. 287, 450 F.2d 1334, 1337-38 (1971) (where uncertificated sales were later determined to have been within FPC jurisdiction, it had "equitable power 'to regard as being done that which should have been done' . . . and to order refunds to be paid if necessary to achieve that goal")
 
 
 [14]
 The company's operations were taken over by the Washington Metropolitan Area Transit Authority on January 14, 1973. See National Capital Area Transit Act of 1972, Pub.L. No. 92-517, 86 Stat. 999 (1972)
 
 
 [15]
 See D.C.Code § 1-1410 (1966)
 
 
 [16]
 See also Zuber v. Allen, 396 U.S. 168, 197, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) (where the Secretary of Agriculture had improperly ordered increase in certain milk prices, the proceeds of such increase having been held in escrow pending judicial review, court "struck an equitable balance" in restoring to purchasers only amounts paid in after District Court reversal of Secretary's order)
 
 
 [17]
 Another express rejection of petitioners' theory appears in Plaquemines Oil & Gas Co. v. FPC, 146 U.S.App.D.C. 287, 450 F.2d 1334 (1971), supra note 13. At issue there was the FPC's power to order refunds for uncertificated sales that were only later determined to be within the Commission's jurisdiction. We endorsed the principle (applied by the Commission to some of the uncertificated sales) that since it lacked cost-of-service information for the period, it would consider rates that were "in line" with those prevailing in the region to be in compliance with the Act. We disapproved the principle (applied by the Commission to other uncertificated sales) that refunds were required simply because the charged rates were not on file with the Commission. See id. at 1336-39
 
 
 [18]
 Railroad rate increases are normally to be effective only on thirty days' notice. The Commission made an exception to this rule, and allowed five days' notice for increases of certain rates of six cents or twenty percent, whichever was less. The carrier put into effect, on five days' notice, a twenty per cent increase, which happened to be more than six cents. The new rates were held not to be lawfully on file with the Commission, and the full amount of the increase was ordered restored
 
 
 [19]
 We may also pass quickly over petitioner Roberts' claim that the Board was without power to inquire into the justness and reasonableness of past rates. It is true that the Board cannot make rates retrospectively, see, e. g., Williams v. Metropolitan Area Transit Commission, 134 U.S.App.D.C. 342, 415 F.2d 922, 940 (1968), but this is not the same thing as inquiring into the propriety of relief and into any issue on which relief turns. See Atlantic Coast Line R.R. v. Florida, 295 U.S. 301, 312, 55 S.Ct. 713, 718, 79 L.Ed. 1451 (1935) (Interstate Commerce Commission was without reparations power but "not without power to inquire whether injustice had been done and to report accordingly.") Even assuming that the Board could not itself order recovery, we have seen that the propriety of recovery may turn on the reasonableness of rates. The Board's primary jurisdiction over that question strongly argues for its power to furnish a retrospective answer to it, even if it is doing so merely as a prelude to action by the courts. In fact the power to do so seems amply embraced within the Board's powers to "conduct such investigations . . . as it shall deem necessary to carry out the provisions of . . . this chapter," 49 U.S.C. § 1324(a) (1970), and, upon "complaint in writing with respect to anything done . . . in contravention of . . . this chapter, . . . to investigate the matters complained of." Id. § 1482(a). The Supreme Court in United States v. Morgan, 307 U.S. 183, 198, 59 S.Ct. 795, 803, 83 L.Ed. 1211 (1939), held that the very similar statutory powers of the Secretary of Agriculture enabled him to investigate the reasonableness of past rates where his doing so would "afford an appropriate basis for action in the district court in making distribution of the (escrow) fund in its custody."
 
 
 [20]
 This is the form of recovery ordered in Bebchick v. Public Utilities Comm'n, 115 U.S.App.D.C. 216, 318 F.2d 187, cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963), and also the form which petitioners propose in this case
 
 
 [21]
 Id. at 228. The interim trunkline standard was adopted in Phase 7 of the DPFI, in which the Board considered the question of what changes in the fare level were dictated by the load factor and other newly adopted rate making standards. See Order No. 71-4-59; App. 283
 
 
 [22]
 Exhibit BE-19; App. 38
 
 
 [23]
 Actually, petitioners offered a recalculation of the trunklines' rate of return only, omitting the local carriers' rate of return and contenting themselves with a statement in their brief that their computations must understate the excess profits for the industry as a whole, the locals being unaccounted for. Br. Petitioners at 52. There is of course no necessary logic in this position. Indeed, the locals maintain that even the full retroactive application of petitioners' proposed load factor, dilution, and indirect cost standards leaves them far short of an adequate return. The claim appears to be uncontested either before the Board or this court, and therefore gives further support to the Board's result
 
 
 [24]
 See Exhibits BE-21, 22, 25, 26; App. 39-42
 
 
 [25]
 In fact the Board found that even if the long term industry-wide factor of 55 percent were applied retroactively, it would produce a rate of return of only 8.83 percent for the trunklines. Board Decision at 17 n. 39; App. 749. Petitioners have not attacked any of these calculations, but rest their hopes on the retroactive application, in addition to the load factors, of dilution and indirect cost standards. The latter arguments are discussed, and rejected, below
 
 
 [26]
 See Order No. 72-12-18 at 11-12; App. 543-44
 
 
 [27]
 Order F-22186, Dockets 15845 et al. (May 20, 1965); Order F-23138, Docket 16826 (Jan. 20, 1966)
 
 
 [28]
 See generally Order No. 72-12-18; App. 529
 
 
 [29]
 Petitioners' expert witness himself admitted that "we have arbitrarily, if I may use that word in a mathematical sense as it was used this morning, drawn that line temporarily at 12 percent." Tr. 641; App. 641. The only justification given for it was that certain evidence adduced in Phase 9 of the DPFI tended to show that dilution traffic was accommodated by added capacity only in the long haul markets, and only in these markets did dilution exceed 12 percent. See Tr. 651-54; App. 74-77
 
 
 [30]
 Thus, a sharp discount offered on short notice for flights already scheduled could generate a large amount of additional traffic but no additional capacity, while a less attractive discount planned longer in advance could cause the airline to schedule additional flights to accommodate the expected traffic increase, even though it was very slight
 
 
 [31]
 A related claim is that petitioners were erroneously assigned the burden of proof as to the reasonableness of the unlawfully established fares. This appears not to be the case. The Board began its investigation by observing that "the carrier parties . . . propose to show the fares accord with all of the substantive standards of the Act just as in any other rate proceeding involving a past period," Order 71-2-109, App. 484; and it concluded its investigation with the statement that "(t)he carriers have abundantly satisfied the evidentiary burden cast on them in this proceeding as to the reasonableness of the fares." Board Decision at 28; App. 760. Nor can we find fault with the merits of the latter conclusion. The airlines established, with the aid of some thirty witnesses and 3500 pages of written exhibits, that their earnings during the period in question were woefully inadequate, even when analyzed according to the appropriate guidelines developed in the DPFI. As stated in text, that was enough to establish the reasonableness of the fares
 
 
 [32]
 See, e. g., Order No. 72-8-50 (DPFI Phase 7; Fare Level) at 46; App. 527
 
 
 [33]
 This question, significantly, we remanded to the Commission in Democratic Central Committee
 
 
 [34]
 The formula unlawfully promulgated by the Board in Order No. 69-9-68 decreased the discounts available to youth standby, youth reservation, and family fare passengers. The same Order advised the carriers that their formula-developed fares, which were to expire in January of 1970, would be renewed only if progress had been made, as assertedly it was, in the publication of additional joint fares and in making long and short haul fares more reflective of actual costs. Board Decision at 30-32; App. 762-64