**ABBOTTS DAIRIES DIVISION OF FAIRMONT FOODS, INC.**

v.

**Earl M. BUTZ, Secretary of Agriculture, U.S. Department of Agriculture, Pennmarva Dairymen's Cooperative Federation Inc., Lehigh Valley Cooperative Farmers and Capitalmilk Producers Cooperative, Inc., Intervening defts., Pennmarva Dairymen's Cooperative Federation, Inc., Intervenors, Appellant in No. 77–2245.**

**ABBOTTS DAIRIES DIVISION OF FAIRMONT FOOD, INC., Appellant in No. 77–2246,**

v.

**Earl M. BUTZ, Secretary of Agriculture, U.S. Department of Agriculture, Pennmarva Dairymen's Cooperative Federation Inc., Lehigh Valley Cooperative Farmers and Capitalmilk Producers Cooperative, Inc., Intervening defts.**

**ABBOTTS DAIRIES DIVISION OF FAIRMONT FOOD, INC.**

v.

**Earl M. BUTZ, Secretary of Agriculture, U.S. Department of Agriculture, Pennmarva Dairymen's Cooperative Federation Inc., Lehigh Valley Cooperative Farmers and Capitalmilk Producers Cooperative, Inc., Intervening defts. Bob Bergland, Secretary of Agriculture, Appellant in No. 77–2247.**

Nos. 77–2245, 77–2246 and 77–2247.

United States Court of Appeals, Third Circuit.

Argued May 22, 1978.

Decided Aug. 1, 1978.

Roland Morris, Sheri B. Friedman, of Duane, Morris & Heckscher, Philadelphia, Pa., for appellant in 77–2246, and for appellee in 77–2245 and 77–2247.

Donald F. Copeland, of Speese, Bongiovanni & Copeland, Philadelphia, Pa., for in-

tervenor-appellants in 77–2245, and for intervenor-appellees in 77–2246 and 77–2247.

Barbara Allen Babcock, Asst. Atty. Gen., Ronald R. Glancz, Atty., U.S. Dept. of Justice, Washington, D.C., James Michael Kelly, Asst. Gen. Counsel, Raymond W. Fullerton, Director, Litigation Div., John H. Vetne, Atty., Office of the Gen. Counsel, U.S. Dept. of Agriculture, Washington, D.C., for appellant in 77–2247, and for appellee in 77–2245 and 77–2246. .

Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Under the Agricultural Adjustment Act of May 12, 1933, 48 Stat. 31, as amended, 7 U.S.C. § 601 *et seq.*, the minimum price at which milk processors and distributors ("handlers") may purchase unprocessed milk from farmers ("producers") is subject to regulation by the Secretary of Agriculture. As a result, milk prices are typically adjusted in accordance with changing economic indices in order to assure, *inter alia*, "an orderly flow of the supply . . . [of milk] to market throughout its normal marketing season to avoid unreasonable fluctuations in supplies and prices." 7 U.S.C. § 602(4). This case raises the question whether Abbotts Dairies Division of Fairmont Foods Company ("Abbotts"), after succeeding ultimately in invalidating a Milk Marketing Order of August 20, 1969, may now recover the difference between the invalid order price and a lesser proposed price for the period between September, 1969 and July, 1970.[1] Also before us are the issues whether the amount of Abbotts' overpayment could be made subject to reduction to the extent that Abbotts "passed

on" any excess prices to its customers, and whether the Secretary must in the first instance consider the restitution question.

The district court, rejecting the passing on defense determined that Abbotts could receive recompense in the amount of the difference between the invalid order price and the price at which Abbotts would have been able to purchase milk during the period in question. The district court determined also that the case should be remanded to the Secretary for ascertainment of that amount and the amount of interest, if any, which should be awarded.[2] For the reasons expressed below we reverse the district court's order of remand to the Secretary and instruct the district court to make findings in the specified areas, as necessary, and enter judgment accordingly.

The procedural history of this case cannot, unfortunately, be stated so briefly as would be desired. Over a period of nine years the issues in this case have been litigated, adjudicated, revised and reconsidered in several different administrative and judicial proceedings. There have been three rulings by the Secretary since the August 20, 1969, Order, pursuant to three administrative proceedings; there has been extensive litigation in the United States District Court, first the Secretary's action for a preliminary injunction before Judge Luongo and then the hearings before and adjudications by Judge Ditter on the validity of the August 20, 1969, Order and the availability of damages; and, now, there have been two appeals to this Court.

Decades ago scholars pressed for reform of the judicial process; they were confident that the new administrative law process would be above all far more expeditious, fair, and responsive than what had sometimes proven to be a slow, protracted judicial process. This case exemplifies one in-

---

1. Abbotts states in its brief that the relevant period for calculating recovery extends from September, 1969 to September, 1970. Brief for Abbotts at 12 n. 6. However, the amount Abbotts has at oral argument indicated it seeks is calculated based on the September, 1969, to July, 1970 period. We will limit our consideration to the latter period because it is the only

one for which damages were sought below and because of the assertions made on oral argument and elsewhere in Abbotts' brief. *See* Brief for Abbotts at 3-4.

2. We intimate no view on the merits of the interest question.

stance in which those lofty expectations of expedition have not been met, and it is difficult to imagine a case intertwined with greater confusion and delay on a problem which, but for the administrative process, was not extremely complex. Despite this Abbotts is confronted with a request for yet another remand which could extend this litigation into its second decade.

The triggering event for this case took place on August 20, 1969, when the Secretary issued a Milk Marketing Order for the Delaware Valley Marketing Area[3] instituting what is known as a "penny-by-penny" system for adjusting the minimum price which a milk handler (e. g., Abbotts) must pay to milk producers. According to this system the minimum price of milk would rise on a penny-by-penny basis in conformity with rises in the price of milk in the Minnesota-Wisconsin area. This penny-by-penny pricing constituted a departure from the Delaware Valley Marketing Area tradition of bracket pricing, by which the price of milk moved in steps of twenty (20) cents when by the relevant economic formula a different bracket became applicable. The practical effect of the penny-by-penny system was that the price of milk became indisputably higher during the period at issue. At a hearing before the Secretary on October 30, 1969, to reopen the matter of the August 20, 1969, Order, Abbotts as well as all producers who were represented opposed the penny-by-penny system in favor of bracket pricing.[4] Significantly, Abbotts' proposal at that hearing was a bracket price different from, and in excess of, the price under the previously valid Marketing Order.[5]

After a hearing and upon finding that Abbotts had refused to pay the August 20, 1969, Order price, Judge Luongo on August 20, 1970, enjoined Abbotts to cease and desist violations of the Marketing Order, to pay in the future the higher minimum price provided in the Secretary's Marketing Order and otherwise adhere to that Order, and to pay $34,126.25 as its due share of the administrative expenses of maintaining a producer-settlement fund.[6] In enjoining Abbotts, Judge Luongo rejected its request, contained in its April 22, 1970, Answer, that if the Government's prayer for an injunction was granted those funds representing the difference between the proposed bracket price Abbotts was willing to pay and the penny-by-penny price the Secretary demanded should be deposited with the court.[7] In rejecting this request Judge Luongo relied upon the view that the reserve in the producer-settlement fund would stand as a ready source for recovery of overpayments in the event the August 20, 1969, Marketing Order was subsequently invalidated.

**3.** On August 1, 1970, the Delaware Valley Marketing Area was merged with two other marketing areas to form the Middle Atlantic Marketing Area. 35 Fed.Reg. 7924, 10,273 (1970).

**4.** A hearing held on June 16 and 17, 1969, was found by Judge Ditter not to have provided any evidence to sustain the Order. The issue of the invalidation of the Order is, of course, not before us.

**5.** The minimum price in effect just prior to the August 20, 1969, Order was $7.17 per hundredweight. The operative Order price put into effect provided for bracketed pricing, although some temporary emergency prices were established. *Abbotts Dairies Div. of Fairmont Foods v. Butz*, 389 F.Supp. 1, 4–6 (E.D.Pa.1975).

**6.** The producer-settlement fund provides a pool by which prices paid to producers by handlers may be adjusted to reflect the value of the use to which the purchased milk was ultimately put. In the context of the complicated administrative scheme, the fund enables producers to receive a uniform minimum price at the time of purchase. *See* 7 C.F.R. § 1004.1 *et seq.*; *Zuber v. Allen*, 131 U.S.App.D.C. 109, 110–111, 402 F.2d 660, 661–62 (1968), *aff'd*, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). The $34,126.25 in administrative expenses is not at issue on this appeal.

**7.** *United States v. Abbotts Dairies Div. of Fairmont Foods, Co.*, 315 F.Supp. 571 (E.D.Pa. 1970).

Judge Luongo determined that under *United States v. Ruzicka*, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290 (1946), the issue of an Order's validity *vel non* could not be raised as a defense to an injunction for compliance. Thus the attempt to place monies on deposit with the court was meant to preserve a fund which might later be the source of refunds should the Order subsequently be invalidated.

On November 27, 1972, Judge Ditter filed an opinion overturning the decision of the Secretary which upheld the penny-by-penny August 20, 1969, Order as being based upon no evidence whatever. 351 F.Supp. 561 (E.D.Pa.1972). The matter was remanded to the Secretary at his request, and later came before Judge Ditter again. In his opinion of January 9, 1975, he again held the August 20, 1969, Order to be invalid, concluding: "[T]here is no substantial evidence to support the decision and it is therefore arbitrary and capricious and must be set aside." 389 F.Supp. 1, 12 (E.D.Pa.1975). In 1976 Judge Ditter yet again spoke to the issue, rejecting the Secretary's motion for reconsideration. 421 F.Supp. 415 (E.D.Pa. 1976), aff'd, 559 F.2d 1207 (3d Cir. 1977) (judgment order).[8] As detailed at the outset, the present appeal follows Judge Ditter's decision on monetary recovery only.

Throughout the procedural history of this case Abbotts and the Government have been the only litigating adversarial parties. A milk farmers' cooperative, Pennmarva Dairymen's Cooperative Federation, Inc. ("Pennmarva"), having been granted limited intervention for the determination of the refund issue, is before us on this appeal asserting, inter alia, that no in personam judgment can be filed against current producers for receipt by producers in 1969 and 1970 of overpayments which were required by a then operative minimum pricing Order.

### I.

■ We will first consider the availability of the passing on defense in the present case. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), established that in a § 4 Clayton Act[9] suit it is no defense that a party seeking to recover overcharges has passed on equivalent price increases to its customers. The court expressed two fundamental and related rationales: first, that permitting a passing on defense would create complex, burdensome and possibly insoluble problems of proof; second, that enforcement of antitrust laws would be impeded if such a defense were deemed litigable.

The economic reasons given in support of the first rationale are not logically limited to antitrust suits. These reasons are illustrated as follows. If the exact amount of an overcharge were passed on by a purchaser-seller, the effect on that purchaser-seller may still have been a negative one for the quantity of sales may have decreased. Even if sales increased after the exact amount of the overcharge was passed on there is no way of determining how much they would have risen absent the overcharge. Also, a defendant could not practically prove that the purchaser-seller would not have raised his prices without passing on an overcharge. If the purchaser-seller would have raised prices in any event, the raising of prices to compensate for the overcharge may have wiped out the prospect of increased profits. Id. at 492–93, 88 S.Ct. 2224.

That the Court's view of the difficulties of proof was decisive in the Hanover decision is made apparent by the exception which it carved. The Court stated that if an "overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged . . ," he may be subject to the passing on defense. Id. at 494, 88 S.Ct. at 2232. This follows logically because the purchaser-seller's profit is, in that case, guaranteed and controlled by a contract rather than by relatively unascertainable economic conditions. In such a circumstance, it is clear both that the overcharge is passed on automatically to that person with whom the purchaser-seller has his "cost-plus" contract and that the quantity of sales and profits remains constant despite the overcharge.

---

**8.** Part of Judge Ditter's decision denied a motion by some producer cooperatives to intervene for all purposes including review of the Order. The court limited intervention to the issue of monetary recovery. This is the aspect of the case which was affirmed by a panel of this court.

**9.** 15 U.S.C. § 15 (1970).

In the present case the Government argues that the milk market is inelastic—that Abbotts was not competitively disadvantaged due to the overcharge because all handlers in the market area had to pay the same price to farmers for milk used for fluid consumption. By this argument the Government seeks to demonstrate that *Hanover's* principal rationale is not here applicable. Yet it does not follow ineluctably from the record that all overcharges were passed on, that total sales remained constant with price rises, and that Abbotts, if it did raise its price, would not have been able to do so successfully without the overcharge. The inelasticity *vel non* of the fluid milk market in the Delaware Valley Marketing Area for the period in question is therefore a matter subject to factual disagreement. Because nothing in the record as developed to the present suggests that Abbotts in fact maintained "cost-plus" contracts during the relevant period, attempts to prove these elements would require at least in part the kind of inquiry which *Hanover* believed would be fruitless. Even if Abbotts' records were to show an increase in its prices commensurate with the overcharges, part of the increase may have been made anyway and only part of the overcharge may have been passed on. Inasmuch as the Court in *Hanover* articulated the need to avoid such complex and unascertainable elements of proof in an antitrust context, we are counselled against permitting those same elements here where the economic complexities promise to be every bit as great.

*Hanover's* other rationale evidenced the Court's concern that permitting a passing on defense would deter enforcement of the antitrust laws. If the ultimate consumers in *Hanover* were the only parties not subject to the passing on defense, the Court observed, no suit would be brought against the perpetrators of the overcharge. 392 U.S. at 494, 88 S.Ct. 2224. In this case it is equally unlikely that individual milk consumers will ever sue to block an invalid milk marketing order raising prices to be paid to producers by handlers.[10] Although unlike antitrust law the Agricultural Adjustment Act does not have as one of its fundamental purposes the prevention of illegal overcharges, it is implicit that the Act envisions effective review of orders claimed to be invalid. It is precisely for this purpose that Congress provided for district court review of the Secretary's marketing orders in 7 U.S.C. § 608c(15)(B). Thus, the need for an effective review mechanism secondarily reaffirms for the present case the applicability of *Hanover's* rejection of the passing on defense.[11]

---

10. The government concedes as much. Government's Brief at 60, n. 52.

It is possible that handlers would *seek to* litigate would-be invalid orders imposing high prices even if restitution were not available, for relief from continuing application of the order could be beneficial and hence provide incentive. It is our conclusion, however, that in such cases there would be much greater incentive simply to pass on all overcharges and avoid the costs and risks of litigation.

We note also that in *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918), a case involving an overcharge on freight by a railroad, Justice Holmes for the Court connected the rejection of the passing on defense in part to privity requirements. It followed that because only a shipper *could* sue the railroad for overcharges the effective prevention of overcharges required that the shipper collect the full overcharge as damage. The result is the same if, apart from privity, only the shipper *would* sue. (Notably, this case was not an antitrust case.)

11. *Hanover* did articulate a possible exception to its rejection of a passing on defense in addition to "cost-plus" contracts: "We also recognize that where no differential can be proved between the price unlawfully charged and some price that the seller was required by law to charge, establishing damages might require a showing of loss of profits to the buyer." *Id.* at 494, 88 S.Ct. at 2232. The Court's only elaboration is by way of footnote:

Some courts appear to have treated price discrimination cases under the Robinson-Patman Act as in this category. See, *e. g., American Can Co. v. Russellville Canning Co.*, 191 F.2d 38 (C.A. 8th Cir. 1951); *American Can Co. v. Bruce's Juices*, 187 F.2d 919, opinion modified, 190 F.2d 73 (C.A. 5th Cir.), petition for cert. dismissed, 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951). [*Id.* at 494 n. 10, 88 S.Ct. at 2232]

In the present case the invalid order price was indeed, at the relevant time, on its face required by law to be paid to the producers, and Abbotts does not argue that there was any

The Government's argument that equitable principles require consideration of a passing on defense does not persuade us differently, for equity should not require the cognizance of a defense whose basis has been, with limited exception, soundly criticized by the Supreme Court as impracticable.

## II.

We turn now to the issue of the measurement of monetary recovery and the related issue of the district court's remand to the Secretary.[12] In *Fairmont Foods Co. v. Hardin*, 143 U.S.App.D.C. 40, 442 F.2d 762 (1971), the court faced a similar question arising not out of an invalid minimum price order but from an invalid location price differential in a milk marketing order. The location differential required some handlers to pay a price greater than the minimum order price for milk received from producers in designated areas. The court invalidated the differential on the ground that the evidence was insufficient to show "an economic service [by producers] of benefit to the handler." *Id.* at 45, 442 F.2d at 767; see *Zuber v. Allen*, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). The court then awarded a refund in the amount of the invalid differential, without a remand to the Secretary:

> The Secretary argues that had the invalidity of this Order been apparent at the time, he would have chosen to replace the differentials with a single Order price, one which would have been higher than the 1965 Eastern Zone price. Thus, according to the Secretary, not all, if any, of Fairmont's payments above the Eastern price can be considered overpayments subject to refund. This argument, based as it is on mere conjecture and supposi-

difference between that amount and the price charged. Yet despite this linguistic similarity to the "no-differential" reference, the present case bears no resemblance to the Robinson-Patman cases cited by the Court in *Hanover* in explanation of its dictum. Those price discrimination cases have been viewed as requiring under Robinson-Patman proof of actual economic loss as an element of a plaintiff's prima facie case, whereas recovery for an overcharge merely requires proof of the overcharge itself. *See* McGuire, *The Passing On Defense and the Right of Remote Purchasers to Recover Treble Damages Under Hanover Shoe*, 33 U.Pitt.L. Rev. 177, 186–87 n. 33 (1971). We need not comment whether this is a correct distinction for we simply do not believe that the Court's reference was meant to undercut the reasons for its holding. The most recent Supreme Court case involving the "passing on" issue, *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), neglected even to mention the "no differential" reference. In rejecting the use of passing on as a device by which remote purchasers could recover damages against defendants who could not use passing on as a defense, Mr. Justice White, the author of *Hanover*, observed for the Court:

> [T]his Court in *Hanover Shoe* indicated the narrow scope it intended for any exception to its rule barring pass-on defenses by citing, as the only example of a situation where the defense might be permitted, a pre-existing cost-plus contract. In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless

of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case. [*Id.* at 2070 (emphasis added)].

Given all the above considerations, we agree with the district court that the argued gap in the applicability of *Hanover* should not justify use of the passing on defense. The Government's contention that the "no-differential" reference was meant as a limitation on the use of the passing on defense rather than as an exception to it is semantical and is not a persuasive explanation of *Illinois Brick's* failure to mention it.

12. It is not clear from the present record or from the parties' briefs or arguments whether the invalid Order price for the period in issue (a period preceding the August 20, 1970, injunction) was required pursuant to a construction of the injunction's commands or by some other method. Abbotts maintains, and the district court found, that Abbotts was able to obtain an adequate supply of milk at its proposed bracket price up to the August 20, 1970, injunction. Tr. Oral Argument, May 22, 1978, at 3 (statement by counsel for Abbotts). Nevertheless, all parties are in agreement that as a result of the Secretary's invalid August 20, 1969, Order, Abbotts has been required to pay some substantial amount for milk in excess both of the last valid marketing order price ($7.17 cwt.) and the intermediary bracket price which Abbotts proposed. This matter can be definitely determined on remand.

tion, ignores the fact that such alternative measures were not utilized, that the Secretary in fact assumed that his Order was valid and imposed the price differentials on the basis of that assumption. We are not persuaded by the argument that had Fairmont not been required to pay a differential, it might have been required to pay the same price anyway as a result of some alternative regulatory scheme. *Id.*, 143 U.S.App.D.C. at 51, 442 F.2d at 773; see *Borden, Inc. v. Butz*, 544 F.2d 312, 319–20 (7th Cir. 1976). Were we to rely on the *Fairmont* analysis it would appear that the amount of recovery in this case should be the difference between the last valid order price and the price paid by Abbotts. In *Fairmont*, the possibility that some intermediary price might have been put into effect, had the Secretary known immediately of the invalidity of the scheme, was viewed as legally irrelevant. We need not, however, decide here whether the last valid price should serve as a basis for measuring a refund since Abbotts asks that its recovery be based on the higher price which it proposed to the Secretary in 1969.

The Government and Pennmarva contend, in opposition to the apparent simplicity of the *Fairmont* formula, that a refund should be based on principles of equitable restitution and hence should require consideration of whether the invalid price was nevertheless a reasonable price.[13] For this proposition they rely in part upon the more recent decision of the District of Columbia Court of Appeals in *Moss v. Civil Aeronautics Board*, 172 U.S.App.D.C. 198, 521 F.2d 298 (1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1977). The court in *Moss*, applying equitable restitution principles, declined to grant a refund to claimants who paid airline passenger rates which were ultimately held invalid. Petitioner in *Moss* unsuccessfully argued that

the difference between the invalidated rate and the last lawful rate should constitute the measure of overpayment recovery. The court recited as findings of fact that the invalidated rate was reasonable, that therefore there was no resulting excess profit or enrichment, and that there existed no "fund of net enrichment from which restitution could appropriately be made." *Id.* at 214, 521 F.2d at 314. Nevertheless, the court rested its conclusion on the view that

[t]he fares in question were charged by the carriers in reasonable reliance on the Board's explicit approval of them. To the extent that the Board was mistaken about the lawfulness of the filing, the consequences of that mistake should not be visited upon the carriers, certainly absent any actual unjust enrichment.

*Id.* 172 U.S.App.D.C. at 214, 521 F.2d at 314–15. To follow literally the quoted *Moss* prescription in the instant matter might be to deny recovery to Abbotts on the theory that the producers who received the overpayments were not at fault. However, because the facts in *Moss* indicate the reasonableness of the invalid fare and the unreasonableness of the last valid fare and because the court concluded that the airlines were not enriched and that there was no fund from which restitution could be made, the holding may be narrowly circumscribed.

▇ *Atlantic Coast Line R. Co. v. Florida*, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 451 (1935), guides us on a path between *Fairmont* and *Moss*. The Court there refused restitution of prices paid pursuant to an Interstate Commerce Commission order. In the time between the issuance of the order replacing what was viewed by the Commission as a discriminatory rate schedule, and the Court's invalidation of it, the claimant carrier had complied. Fourteen months after the declaration of invalidity, the Inter-

---

13. In *Atlantic Coast Line R. Co. v. Florida*, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935), although the Court denied restitution to the party who paid, pursuant to an order later held invalid, freight rates in excess of the last valid rates, the Court's analysis rested on the view that restitutionary power was "ancillary" to the power of the district court to determine the

validity of the Commission's order. *Id.* at 314. It is our view that an analogous equitable restitutionary power exists in this case, subject of course to the equitable principles enunciated in *Atlantic Coast*. See also *Moss v. Civil Aeronautics Board*, 172 U.S.App.D.C. 198, 206–207, 521 F.2d 298, 306–07 (1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1977).

state Commerce Commission repromulgated the same order without defect based upon new evidence and new findings.[14] The Court accepted as fact that the rate in effect prior to the invalidated order was "less than compensatory and would result in confiscation . . .," *id.* at 313, 55 S.Ct. at 718, and further observed that the claimants failed to show the unreasonableness of the rate established by the invalid order. *See id.* at 318, 55 S.Ct. 713. The Court rejected arguments for applying an intermediary rate in the absence of a showing that invalid one was unreasonable. We view *Atlantic Coast* to instruct that the unreasonableness of an invalid administrative agency rate and the reasonableness of the rate sought to be used as a measure must appear before restitution of an overpayment can be decided.

In the present case unlike *Atlantic Coast,* Abbotts' proposed bracket price formula was also proposed at the October, 1969, Department of Agriculture hearing by the Interstate Milk Producers representing seventy-five percent of the milk producers in the Delaware Valley area. This fact, as determined by the district court and not urged to be clearly erroneous, is itself persuasive of the reasonableness of the proposed price. The area tradition of pricing at the required minimum and availability of milk to Abbotts at the proposed bracket prices up to the August 20, 1970, injunction,[15] although viewed insufficient by the district court, reaffirm that conclusion. Furthermore, the Secretary's penny-by-penny price was itself unanimously opposed by the witnesses at the October 1969 hearing.

It was this total absence of evidentiary support which led the district court to conclude that it was arbitrary and capricious. Indeed, we note in passing that, unlike *Atlantic Coast,* the record reveals that in six years since the invalidation of the 1969 Order there has been no repromulgation based on evidence favoring penny-by-penny pricing. Although Pennmarva states that a hearing was held by the Secretary in October, 1977, that proceeding could not reasonably be expected to affect the issue of the fairness of the penny-by-penny Order in 1969 and 1970, given the facts as already described.

In view of these circumstances, the producers who received overpayments did, we believe, receive enrichment in the form of excessive and unlawful prices, though they were certainly not at fault for the actual issuance of the Secretary's order. Equitable restitution to Abbotts to the extent of the monies in the producer-settlement fund reserve is therefore appropriate in our view. Denial of restitution on the facts presented here would virtually remove any possibility of recovery of overpayments due to invalid milk pricing orders. We do not believe that *Atlantic Coast* contemplated such a broad scale denial.

There additionally appears to be no reason for a remand to the Secretary.[16] Attempting to ascertain in this case the price at which Abbotts would have been able to purchase milk seems meaningless in light of the district court's statement that Abbotts continued to purchase milk at the proposed bracket price prior to the August 20, 1970,

---

14. The Court specifically observed: "During the years affected by the claim there existed in very truth the unjust discrimination against interstate commerce that the earlier decision had attempted to correct. If the processes of the law had been instantaneous or adequate, the attempt at correction would not have missed the mark." *Id.* at 311–12, 55 S.Ct. at 717.

15. The stated fact that Abbotts continued to obtain milk at the proposed bracket price until the injunction seems to undermine the district court's decision to remand for a determination of the price which Abbotts would have had to

pay for milk for the relevant period, since the relevant period preceded the injunction.

16. The provision conferring jurisdiction to the Secretary, 7 U.S.C. § 608c(15)(A), does not provide any specific indication that the Secretary may go beyond the determination initially of the validity or scope of a marketing order. In any event the issues left to be decided in this case are not of the kind which are peculiarly within the expertise of the Secretary and which might otherwise justify resort to the administrative process. *See Nader v. Allegheny Airlines,* 426 U.S. 290, 305–06, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976).

injunction. Even without this fact an inquiry into what the price of milk would have been would not likely contribute anything to the evidence since the effect of the invalid Order itself during the period in question would naturally be considerable, reducing the probative quality of any attempt at reconstructing economic history. This or related litigation has already extended over an eight year period and has received considerable judicial and administrative attention, as described earlier. At this stage we cannot view lightly the possibility of further complication and delay.

### III.

The precise amounts determined by Herbert L. Forest [17] (as the difference between the total price required to be paid by Abbotts for milk from September, 1969, through July, 1970, and the proposed bracket price) should serve as the basis for an award of restitution to Abbotts unless: (1) the district court, in addressing the matter of the amount of Abbotts' overpayment, finds that not all of the milk purchased by Abbotts during the relevant period was paid for at the invalid penny-by-penny price due to obligations stemming from the invalid Order; or (2) the possibility of cost-plus contracts between Abbotts and others is properly raised and the cost-plus exception to *Hanover* is deemed applicable.[18] The reserve in the producer-settlement fund will serve as the source for the refund of this overpayment.[19]

The district court's Order remanding this case to the Secretary will be vacated and the matter will be remanded to the district court for disposition in accordance with the above opinion.

---

**17.** Mr. Forest calculated the difference between payment of penny-by-penny prices and bracket prices by Abbotts for the relevant period. Mr. Forest assumed that all Abbotts' purchases of milk were ultimately at the penny-by-penny rate. No party has contested the accuracy of his calculations given the underlying assumption.

ABBOTTS' CLASS I VALUE CHANGES WITH BRACKETED PRICE

| Months | Class I Lbs. of Milk | Change in Price | Change in Value |
|---|---|---|---|
| Sept '69 | 22,723,613 | − 9¢ | $ − 20,451.25 |
| Oct | 24,594,803 | + 4¢ | + 9,837.92 |
| Nov | 21,907,402 | − 5¢ | − 10,953.70 |
| Dec | 22,800,526 | − 9¢ | − 20,520.47 |
| Jan '70 | 22,194,193 | − 10¢ | − 22,194.19 |
| Feb | 20,220,229 | − 14¢ | − 28,308.32 |
| Mar | 21,701,959 | − 10¢ | − 21,701.96 |
| Apr | 22,458,730 | − 5¢ | − 11,229.37 |
| May | 21,252,311 | − 7¢ | − 14,876.62 |
| Jun | 19,923,017 | − 5¢ | − 9,961.51 |
| Jul | 20,221,225 | − 8¢ | − 16,176.98 |
|  |  |  | $ − 166,536.45 |

*See* Affidavit of Herbert L. Forest, Director, Dairy Division, Agricultural Marketing Service, Department of Agriculture, April 29, 1975, at 5; *Abbotts Dairies Division of Fairmont Foods Company v. Bob Bergland*, C.A., 438 F.Supp. 629 at 631, Slip Op. at 4 (E.D.Pa.1977).

**18.** The district judge must also consider the issue whether interest is recoverable and, if so, its amount.

**19.** At present both the Government and Pennmarva have acknowledged the acceptability of employing the reserve in the producer-settlement fund as the sole source of refund to Abbotts. Tr. of Oral Argument, May 22, 1978, at 24–25 (statement of counsel for Pennmarva); Government's Brief at 7. This is so even though the overpayments consist of money paid to producers directly in 1969 and 1970, and even though some producers presently in the market were not direct beneficiaries of the excessive invalid order price for the period in issue. We believe that this fluid fund, designed essentially as a pool by which milk prices may be made uniform, is a permissible source for the refunding of the overpayments at issue here. *See Borden, supra; Fairmont, supra.* We emphasize that the above decision is not based on any view that producers are liable *in personam* and is intended to be applicable solely to the factual situation in which a reserve fund exists. We do not pass upon the situation in which no fund exists or in which restitution is sought from the producers themselves. Nor do we decide upon the availability of the passing on defense where producers are sought to be held personally liable for overpayments.